No. 68,361

STATE OF KANSAS, *Appellee*, v. FAYE A. JOHNSON-HOWELL, *Appellant*.

(881 P.2d 1288)

Opinion filed September 16, 1994.

*Benjamin C. Wood*, special appellate defender, of Lawrence, argued the cause, and was on the brief for appellant.

*W. Scott Toth*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Faye Johnson-Howell appeals her convictions of one count of first-degree murder, K.S.A. 1989 Supp. 21-3401, and one count of conspiracy to commit murder, K.S.A. 1989 Supp. 21-3401 and K.S.A. 21-3302. Defendant claims (1) she was denied her state and federal constitutional rights to confront a nontestifying codefendant; (2) illegal wiretap information was admitted; (3) she was denied the right to present evidence; and (4) she did not receive a fair trial because of cumulative errors.

Johnson-Howell was charged with (1) aiding and abetting and (2) conspiring with LaJuan Clemons to commit first-degree murder of Charles Howell, her estranged husband. See *State v. Clemons*, 251 Kan. 473, 836 P.2d 1147 (1992), where LaJuan Clemons' conviction of the first-degree murder of Howell was affirmed.

Johnson-Howell and Howell had separated. While separated, Johnson-Howell had plotted over the telephone with others to kill Howell; Howell had recorded the telephone conversations. When he informed the police of the plot, things "cooled down." The couple's divorce action was to be heard the day Howell was murdered. Howell was shot twice in the head in Olathe on February 8, 1990. An autopsy on Howell revealed that he had suffered two shotgun wounds. One wound was caused by a shotgun slug and the second by pellets from a shotgun blast.

At Johnson-Howell's trial, Bobbi Bolton, Howell's girlfriend, with whom he had been living, testified that she heard the gunshots, went outside, and found Howell's body. She called 911 and told the dispatcher that Howell had been shot. Bolton also told the dispatcher that she had observed a light blue four-door small to mid-size car, possibly a rental car, with red license plates, located on the street behind her house in an area which was under development. At trial Bolton identified a picture of a System One rental car as the car she saw the day of the homicide. On cross-examination, she admitted she had previously told the police that she thought the blue car was a Chevy Nova.

During the murder investigation, two System One employees informed investigating officers that Johnson-Howell had rented a blue Dodge Spirit automobile. Johnson-Howell, accompanied by

Clemons, had picked up the car on February 7, 1990, and they had returned the car about "11:30 in the afternoon." The "System One" bumper sticker had been removed. It was not unusual for cars to be returned with the bumper stickers removed. The police obtained a search warrant and seized the car at noon the same day. A search of the car led to the discovery of a set of keys in the car and a fingerprint on the trunk. The car had mud on the driver's floorboard area. It was later determined the keys belonged to Clemons, and it was his fingerprint on the trunk of the rental car. The tires on the rental car matched tire tracks found where Bolton saw the rental car parked. A police officer who had responded to Bolton's 911 call testified that as he approached the area, he observed a car leaving the area that was similar to a car which had been rented by the defendant.

Julius Olubo, an employee at Johnson-Howell's insurance agency, testified that on the day of the homicide Clemons showed up at the insurance agency at about 8:45 a.m. Olubo testified Clemons was driving a car similar to the rental car identified by other witnesses.

Detectives from Olathe interviewed Clemons at his apartment on February 9, 1990, at approximately 12:30 a.m. At the time Clemons was being interviewed, there were numerous other possible suspects in the homicide, and 11 detectives working throughout the metropolitan area were following leads. Initially, Clemons identified himself as Nelson Brown and advised the detectives that he knew LaJuan Clemons but had not seen him for at least one day. Eventually, he admitted he was LaJuan Clemons. Clemons told the officers that he and Johnson-Howell were lovers. On February 11, 1990, police executed a search warrant at Clemons' residence and recovered two shotgun shells similar to the shells used to kill Howell. The search of Clemons' bedroom also yielded an answering machine stolen from Bolton's apartment in June 1989. On February 15, 1990, Clemons was arrested and charged with murder.

An expert in military equipment who had been Clemons' superior in the military testified that footprints found leading to and away from the homicide scene were made by a particular kind

of boot Clemons could have purchased while in the Army reserves. When Clemons' apartment was searched, a variety of military clothing was found, but no boots.

A police officer interviewed Max Howell, the young son of Howell and Johnson-Howell, several days after the homicide. The day of the homicide Max, who was living with his mother, called his father at home at about 7:00 a.m. The police believed that the son had been used to determine if his father was home and not at work. Bolton testified that she heard Howell answer the phone and say, " 'If you thought I was at work, why did you call?' " Howell worked the 6:00 a.m. to 2:30 p.m. shift at his job. Howell told Bolton the call was from Max. Bolton testified Max had never called at that time in the year she had been living with Howell. Max testified his mother knew he was calling his father but she did not tell him to do so.

In a May 1989 phone conversation recorded by Howell, Johnson-Howell told Frank Parker, a friend and former employee of hers, that she wanted Howell dead. She told Parker she was plotting with a former lover, Henry Arbrought, to kill Howell. Johnson-Howell asked Parker to give Arbrought some money for the murder. Johnson-Howell later told Parker that Arbrought would not commit the murder. She stated that she would have Clemons do it instead. Neither Johnson-Howell nor Parker knew the conversation was being taped by Howell. The State introduced, over the defense's objection, the taped telephone conversation. Parker testified that prior to the telephone conversation, Howell had physically assaulted Johnson-Howell in front of Parker and the Howells' son at Johnson-Howell's office.

During the trial, the following occurred outside the presence of the jury: Clemons was to be a witness for the State. Clemons' attorney told the court that Clemons was aware he had previously waived his Fifth Amendment privilege by testifying at his trial and understood he [Clemons] would be held in contempt of court if he refused to answer any questions. When Clemons refused to answer any questions, the judge found Clemons in contempt.

In order to obtain admission of Clemons' prior statement to investigating officers, the State requested that the judge find Cle-

mons to be an unavailable witness. The defense objected, claiming it would not be able to confront and cross-examine Clemons regarding his statements to the officer. To provide the defendant his right to confront Clemons, the judge decided to have Clemons sworn in front of the jury, allow the State to examine him, and then, if Clemons answered the State's questions, let the defense cross-examine. The judge withdrew his finding that Clemons was in contempt.

Clemons took the stand and was sworn. In front of the jury, Clemons refused to answer the prosecutor's questions. The State requested that Clemons be declared a hostile witness so it could ask leading questions. The defense's objection was overruled. The State proceeded to ask leading questions. Clemons refused to answer the questions. After the State had completed asking Clemons a series of leading questions about his prior statements to the officers, which Clemons refused to answer, the judge informed the defense it could cross-examine Clemons within the scope of the questions asked by the prosecutor. The defense pointed out that because Clemons had not answered a question, there was no scope of direct examination to stay within and did not cross-examine the witness. The jury was excused, and the judge then found Clemons to be in contempt.

Over the defense's hearsay objection, the State was able to introduce the statements made by Clemons to the police the day after the homicide as an exception to the rule against admission of hearsay. Detective Halloran testified that when he talked to Clemons the day after the homicide, Clemons stated he knew Howell had been murdered. Clemons also admitted he and the defendant drove a rental car to Howell's residence the night before the homicide and then "went to the street behind the residence and counted over the number of houses that Charles Howell's residence was."

A Kansas City, Missouri, police officer testified that about a month before the homicide he stopped Clemons, who was driving a rental car which had been rented by Johnson-Howell, and found two loaded handguns in the vehicle. A forensic serology specialist testified that an examination of Clemons' army jacket did not re-

veal any bloodstains. The State asked whether, hypothetically, bloodstains would be present if the jacket was worn by the shooter. The defense objected that the question was speculative, but the court overruled the objection. The expert said there were so many variables involved, he could not answer the question.

Johnson-Howell testified she rented a car because her car was being repaired. She stated she had no involvement in Howell's killing. She related all of her activities on the morning of the homicide, including a stop at a beauty salon where she had her hair done. On cross-examination she testified she did not believe Clemons killed Howell. Johnson-Howell admitted that she had written a letter to Oprah Winfrey after her indictment and either threatened to kill Howell or to have him killed. The defense attempted to introduce a subsequent letter written to Winfrey by Johnson-Howell in which she detailed Howell's involvement in drug trafficking. The State objected to its introduction. The judge found that the second letter was self-serving and that without further foundation it was not admissible. The defense did not provide additional foundation.

Johnson-Howell's hair stylist testified that Johnson-Howell came to the salon at about 8:15 or 8:30 a.m. the day of the homicide. Johnson-Howell had testified that she normally had her hair done on Fridays but she set up this appointment because of the divorce hearing set for later that day. On cross-examination the State inquired if the stylist knew whether the purpose of the appointment was to establish an alibi for the defendant. The defense objection to the question as speculative was sustained.

Johnson-Howell was convicted of first-degree murder, under the aiding and abetting theory, a class A felony, K.S.A. 1989 Supp. 21-3401; and conspiracy to commit first-degree murder, a class C felony, K.S.A. 1989 Supp. 21-3401 and K.S.A. 21-3302. She was given consecutive sentences of life on the murder charge and 4-15 years on the conspiracy charge.

*Admissibility under Hearsay Exceptions*

Johnson-Howell argues the introduction of Clemons' statements at trial denied her the constitutional right to confront the witness against her. In addition, she argues the statements were

not admissible under any of the statutory exceptions to the prohibition against the admission of hearsay, K.S.A. 1989 Supp. 60-460 (now 1993 Supp.).

Because the State sought to introduce the statements of the unavailable witness at trial, it had the burden to provide the foundation for the admission of those hearsay statements into evidence. To obtain admission of the hearsay statements, the State had to demonstrate that the witness was unavailable, and then the court must have found that the statements bore sufficient indicia of reliability or showed particularized guarantees of trustworthiness.

In *State v. Myers*, 229 Kan. 168, 172, 625 P.2d 1111 (1981), we noted that a footnote in *Ohio v. Roberts*, 448 U.S. 56, 65 n.7, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980), stated a demonstration of unavailability is not always required. That footnote stems from a concurring opinion to the plurality opinion in *Dutton v. Evans*, 400 U.S. 74, 95-96, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970), where Justice Harlan opined, "A rule requiring production of available witnesses would significantly curtail development of the law of evidence to eliminate the necessity for production of declarants where production would be unduly inconvenient and of small utility to a defendant." We point out that our case does not involve issues of inconvenience or limited utility to defendant's defense by requiring production of the codefendant as a witness.

Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible, subject to enumerated exceptions. The State argues the statements were admissible as a previous statement of a person present, K.S.A. 1993 Supp. 60-460(a); as a contemporaneous statement by an unavailable witness, K.S.A. 1993 Supp. 60-460(d)(3); a vicarious admission, K.S.A. 1993 Supp. 60-460(i); and a declaration against interest, K.S.A. 1993 Supp. 60-460(j). A review of the exceptions to K.S.A. 1993 Supp. 60-460 claimed by the State to be relevant reveals that none apply here.

K.S.A. 1993 Supp. 60-460(a) provides:

"*Previous statements of persons present.* A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

This exception does not apply because Clemons refused to testify; therefore, he was not available for cross-examination.

K.S.A. 1993 Supp. 60-460(d) provides:

"*Contemporaneous statements and statements admissible on ground of necessity generally.* A statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."

Under the hearsay rule, a witness is unavailable if the witness is (1) exempted on the ground of privilege from testifying concerning the matter to which his or her statement is relevant, (2) disqualified from testifying to the matter, (3) unable to be present or to testify at the hearing because of death or then existing physical or mental illness, (4) absent beyond the jurisdiction of the court to compel appearance by its process, or (5) absent from the place of hearing because the proponent of his or her statement does not know and with diligence has been unable to ascertain his or her whereabouts. K.S.A. 60-459(g).

A witness is not unavailable (1) if the judge finds that his or her exemption, disqualification, inability, or absence is due to procurement or wrongdoing of the proponent of his or her statement for the purpose of preventing the witness from attending or testifying, or to the culpable neglect of such party; or (2) if unavailability is claimed because the witness is absent beyond the jurisdiction of the court to compel appearance by its process, and the judge finds that the deposition of the declarant could have been taken by the exercise of reasonable diligence and without undue hardship and that the probable importance of the testimony is such as to justify the expense of taking such deposition. K.S.A. 60-459(g).

Clemons was not an unavailable witness as defined by K.S.A. 60-459(g). *Cf. State v. Mack,* 255 Kan. 21, 33, 871 P.2d 1265

(1994) (witness living in Germany; beyond jurisdiction of court to compel attendance); *State v. Green*, 254 Kan. 669, 680, 867 P.2d 366 (1994) (witness had Fifth Amendment privilege to refuse to testify; exercise of privilege made witness unavailable); *State v. Vaughn*, 254 Kan. 191, 201, 865 P.2d 207 (1993) (failure of good faith efforts to locate witness before trial, other examples discussed). K.S.A. 1993 Supp. 60-460(d)(3) does not apply because Clemons was not unavailable as defined by K.S.A. 60-459(g).

K.S.A. 1993 Supp. 60-460(i) provides:

"*Vicarious admissions.* As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination . . . ."

The exception contained in 60-460(i)(2) is not applicable because the statements by Clemons to the officers were made after the crime had been completed. See *Myers*, 229 Kan. at 173.

K.S.A. 1993 Supp. 60-460(j) provides:

"*Declarations against interest.* Subject to the limitations of [60-460] (f), a statement which the judge finds was at the time of the assertion so far contrary to the declarant's pecuniary or proprietary interest or so far subjected the declarant to civil or criminal liability or so far rendered invalid a claim by the declarant against another or created such risk of making the declarant an object of hatred, ridicule or social disapproval in the community that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true."

The declarations against interest exception of 60-460(j) also does not apply because the statements did not, by themselves, subject Clemons to criminal liability. *Cf. State v. Jones*, 246 Kan. 214, 219, 787 P.2d 726 (1990) (statements made by unavailable codefendant that he and two others, rather than the defendant, were involved in shooting were admissible as declarations against interest). Although the statements made by Clemons were circumstantial evidence that supported an inference that he knew Howell had been killed and was at the crime scene prior to the murder, they are not sufficient to subject him to criminal punishment.

*Incriminating Statements By A Nontestifying Codefendant*

Johnson-Howell challenges the admission of statements of her codefendant that incriminated her, through the testimony of an investigating officer. Johnson-Howell argues that the unorthodox methodology of the court in allowing the investigating officer to recite the previous statements of a codefendant, a State's witness who refused to answer questions in the presence of the jury, denied her the right to confront the declarant.

The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against the accused. In *Pointer v. Texas*, 380 U.S. 400, 403, 13 L. Ed. 2d 923, 85 S. Ct. 1065 (1965), the Supreme Court held that this is a fundamental right and is made obligatory on the states by the Fourteenth Amendment. See *State v. Willis*, 254 Kan. 119, 123, 865 P.2d 1198 (1993). This constitutional provision, however, does not preclude the admission of all hearsay evidence. See *Ohio v. Roberts*, 448 U.S. at 63. Ordinarily, admissibility of evidence, including hearsay, is within the discretion of the trial judge. See *State v. Thomas*, 252 Kan. 564, 572, 847 P.2d 1219 (1993). That discretion is not unbounded. It should be noted that the hearsay rule and the Confrontation Clause "generally" serve the same interests, but sometimes do diverge. *Ohio v. Roberts*, 448 U.S. at 66; *Dutton v. Evans*, 400 U.S. at 81-82. The Confrontation Clause places "limitations on the admissibility of hearsay evidence in criminal cases which are not applicable in civil cases." *State v. Myers*, 229 Kan. at 172. The courts should attempt to "harmonize the goal of the [Confrontation] Clause—placing limits on the kind of evidence that may be received against a defendant—with a societal interest in accurate factfinding, which may require consideration of out-of-court statements." *Bourjaily v. United States*, 483 U.S. 171, 182, 97 L. Ed. 2d 144, 107 S. Ct. 2775 (1987).

When the Confrontation Clause becomes an issue as to the unavailability of a witness, whether the witness is unavailable is a question of law. See *Jennings v. Maynard*, 946 F.2d 1502, 1504 (10th Cir. 1991) ("We review an issue of unavailability under the Confrontation Clause de novo."). Under the Confrontation

Clause, the inquiry is whether the State has made a good faith effort to obtain the presence of the witness at the trial. *Ohio v. Roberts*, 448 U.S. at 74. The defendant claims that the production of the witness by the State was not made in good faith because the State knew that the witness would refuse to testify.

To support its claim that it made a good faith effort to produce the witness and, therefore, the codefendant's statements to the officer were admissible, the State points to *State v. Mitchell*, 3 Kan. App. 2d 635, 599 P.2d 1025 (1979). In *Mitchell*, the Court of Appeals stated that when the trial judge has reasonable cause to believe a witness will refuse to testify, it is better practice to conduct a hearing outside the presence of the jury to ensure that the defendant's right to a fair trial is not inadvertently violated; but when the witness has no legal right to refuse to testify, it is not reversible error per se for the court to refuse to conduct such a hearing. 3 Kan. App. 2d at 640.

A somewhat similar situation occurred in *Jennings v. Maynard*, 946 F.2d 1502. In *Jennings*, a witness refused to testify in an Oklahoma state court proceeding. The witness claimed that he and his family had been threatened with harm if he testified. The 10th Circuit Court of Appeals found a refusal to testify because of threats was a "well-established ground" for finding a witness unavailable under both Oklahoma and federal rules of evidence. 946 F.2d at 1505.

Witnesses have a state and federal constitutional right against compelled self-incrimination. Except as otherwise provided by statute, every person is qualified to be a witness. No person has a privilege to refuse to be a witness or to refuse to disclose any matter, and no person has a privilege that another shall not be a witness or shall not disclose any matter. K.S.A. 60-407 (a), (b), (d), and (e). Subject to K.S.A. 60-423 and K.S.A. 60-437, every natural person has a privilege, which he or she may claim, to refuse to disclose in an action or to a public official of this state or the United States or any other state or any governmental agency or division thereof any matter that will incriminate such person. K.S.A. 60-425. A matter will incriminate a person if it constitutes, or forms an essential part of, or, taken in connection

with other matters disclosed, is a basis for, a reasonable inference of such a violation of the laws of this state as to subject the person to liability to punishment therefor, unless he or she has become for any reason permanently immune from punishment for such violation. K.S.A. 60-424. Except as otherwise provided by the Kansas Constitution, the federal Constitution, and our state statutes, every person is qualified to be a witness.

A person who would otherwise have a privilege to refuse to disclose a matter has no such privilege as to that matter if the judge finds that such person, without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter. K.S.A. 60-437(b). If a privilege is exercised not to testify or to prevent another from testifying, either in the action or with respect to particular matters, or to refuse to disclose or to prevent another from disclosing any matter, the judge and counsel may not comment thereon, no presumption shall arise with respect to the exercise of the privilege, and the trier of fact may not draw any adverse inference therefrom. In those jury cases wherein the right to exercise a privilege, as herein provided, may be misunderstood and unfavorable inferences drawn by the trier of the fact, or may be impaired in the particular case, the court, at the request of the party exercising the privilege, may instruct the jury in support of such privilege. K.S.A. 60-439.

A witness' refusal to testify in a criminal trial is not a recognized ground for unavailability of the witness in this state. See *State v. Lomax & Williams,* 227 Kan. 651, 660, 608 P.2d. 959 (1980). In *Lomax* a witness, Mary Ellen Bagby, had identified the three males at a codefendant's preliminary examination as the individuals who had committed the robbery. When called to testify at the defendants' trial, the witness stated that she would not testify because she could not remember what had occurred during the robbery. Bagby was declared a hostile witness, and the prosecutor questioned Bagby about her prior testimony at a codefendant's preliminary examination by reading the question and the answer which Bagby gave at that hearing. Bagby's responses were that she could not remember or recall either the question or her an-

swer. When defense counsel cross-examined the witness, she again stated that she did not remember anything.

The *Lomax* court reviewed federal cases which held that where a prosecution witness refuses to take an oath or refuses to give testimony of any sort or responds with answers such as "I don't recall" or "I don't know," the prior hearsay statements are not admissible under the constitutional confrontation rule. It then noted that in *United States v. Fiore*, 443 F.2d 112 (2d Cir. 1971), the court held that prior grand jury testimony of a witness who refused to testify at a subsequent trial was not admissible. Pointing out that the witness was not subject to cross-examination by the defendant because of his refusal to testify, the *Fiore* court stated that the admission of his grand jury testimony violated not only the hearsay rule but also the confrontation rule of the Sixth Amendment.

In *Fiore*, the witness had been placed on the stand by the prosecutor and, when asked if he had previously testified before the grand jury, answered, "I don't remember." There followed a protracted examination in which the prosecutor read portions of the grand jury testimony framed by the questions, "Were you asked the following questions and did you give the following answers?" The witness invariably gave such answers as, "I might have," or "I don't know whether I did or not." 443 F.2d at 114. This line of questioning was held to be reversible error on the basis that the witness was not available for cross-examination as required by defendant's constitutional right of confrontation.

The *Lomax* court noted that in *United States v. Gonzalez*, 559 F.2d 1271 (5th Cir. 1977), the court reversed a conviction for marijuana possession, holding that the grand jury testimony of a coconspirator who refused to testify at the trial was not admissible hearsay. The witness had already been convicted, was granted immunity, and was ultimately found in contempt when he refused to testify. The case was reversed on the basis that the witness was unavailable as a witness under Fed. R. Evid. 804(a). The *Gonzales* court did not consider it necessary to consider the defendant's argument that the introduction of such evidence violated his right to confront witnesses. 559 F.2d at 1274.

In *Gonzalez,* reference is made to *United States v. Carlson,* 547 F.2d 1346 (8th Cir. 1976), *cert. denied* 431 U.S. 914 (1977), where the federal district court had held admissible the grand jury testimony of a witness who refused to testify because of threats directed against him by the defendant Carlson. On appeal, the *Carlson* court held that the defendant had waived his right of confrontation since the witness' refusal to testify was procured by the accused. 547 F.2d at 1358. The *Gonzalez* court refused to apply the exception stated in *Carlson* because there were no threats of harm directly attributed to defendant Gonzalez. 559 F.2d at 1274. It is important to note that in *Lomax* there was no finding by the trial court that the refusal of Mary Ellen Bagby to testify was the result of threats made to her by the defendants. 227 Kan. at 660-61.

The *Lomax* court applied the basic principles previously discussed and concluded that Mary Ellen Bagby was not available for cross-examination by the defendants Lomax and Williams during their trial or the preliminary hearing of Cashley Woods. Under these circumstances, Lomax and Williams were not afforded the right of cross-examination. The *Lomax* court noted that Mary Ellen Bagby was obviously a recalcitrant witness from the beginning of the defendants' trial. It observed that she testified at Woods' preliminary examination only after being threatened with punishment for contempt. When called as a witness at the trial of Lomax and Williams, she again refused to testify, stating that she could not recall what happened. Although she failed to testify as hoped for by the State, her testimony was not affirmative, contradictory, or adverse to the party calling her, as required by *State v. Potts,* 205 Kan. 47, 52, 468 P.2d 78 (1970). She simply refused to testify, claiming that she could not remember. The *Lomax* court interpreted the evidentiary record as establishing a clear case where a witness simply refused to testify at the trial by claiming that she could not remember what happened. It found that this is not a case where a witness, acting in good faith, was unable to testify as to the subject matter of her prior statement because, through no fault of her own, she had lost her memory as to the events. It determined that the prior testimony of Mary Ellen

Bagby was not admissible although she was present at the hearing, because she was not available for cross-examination. The court found that the admission of Bagby's testimony violated the defendants' right to confrontation as provided for in the United States and Kansas Constitutions. The case was reversed. 227 Kan. at 661-62.

In *State v. Myers*, 229 Kan. 168, 173-75, 625 P.2d 1111 (1981), an analogous situation occurred during Joe Myers' trial for murder. Shortly after the murder, Lorin Axvig informed his wife that he and Myers had killed someone. Warrants were issued for the arrest of Myers and Axvig for murder. Prior to Myers' trial, Axvig was killed in Texas. In Myers' trial, the State attempted to introduce Axvig's statement to his wife. For authority to admit the statement, on appeal the State directed our attention to 60-460(d)(3), which provides an exception to the hearsay rule where a declarant is unavailable as a witness and the statement offered is one narrating, describing, or explaining an event which the judge finds was made by the declarant when the matter had been recently perceived by the declarant and while his or her recollection was clear, and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort. The State also argued that the oral statements of Lorin Axvig were admissible under the hearsay exception contained in 60-460(j) as a declaration against penal interest.

The *Myers* court concluded that if the State was correct in its position, then the specific statutory limitations on the admissibility of confessions (60-460[f]) and incriminating statements of coparticipants (60-460[i]) would, in effect, be totally nullified. It did not believe that it was the intent of the legislature to permit hearsay confessions and extrajudicial statements of coparticipants in crime to be admitted against the accused in a criminal case without satisfying the requirements set forth in those subsections of 60-460. Sections 60-460(f) and 60-460(i) controlled where the issue before the court at a criminal trial is the admissibility of the confession or hearsay statement of a coparticipant. The *Myers* court determined that must be the law in light of the purpose of the Confrontation Clauses of the Sixth Amendment and Section

10 of the Kansas Constitution Bill of Rights. In reaching that conclusion, it considered the fact that in Kansas out-of-court hearsay statements of coparticipants in crime have traditionally been considered as unreliable and untrustworthy. In fact, the testimony of an accomplice against an accused is considered so unreliable as to require a precautionary instruction where there is a lack of evidence which corroborates the testimony of the accomplice. 229 Kan. at 174-75. See *State v. Moody*, 223 Kan. 699, 576 P.2d 637, *cert. denied* 439 U.S. 894 (1978).

Applying the Kansas statutes to the facts of this case, Clemons was not an unavailable witness. The conviction and sentencing of Clemons, and the resolution of his direct appeal, removed all protection of the Fifth Amendment for any incriminating testimony Clemons might provide at Johnson-Howell's trial. See *State v. Anderson*, 240 Kan. 695, 700, 732 P.2d 732 (1987). Unlike the witness in *Jennings*, Clemons' reason for refusing to testify was not fear of retaliation by the defendant. Under the circumstances, Clemons possessed no privilege to refuse to testify when called as a witness. He was a witness who chose not to testify, even after being ordered to by the trial judge and threatened with being found in contempt. *Cf. State v. Bird*, 238 Kan. 160, 174, 708 P.2d 946 (1985) (witness who exercised her Fifth Amendment privilege against self-incrimination was unavailable for purposes of confrontation). The trial court did not have discretion to require Clemons to take the stand before the jury and to order him to answer the questions posed by the State.

Clemons was not subject to cross-examination by the defendant because of his refusal to testify. The admission of Clemons' statements not only violated the hearsay rule, their admission violated the accused's state and federal constitutional right of confrontation.

*Harmless Error*

The State argues the admission of the codefendant's statements into evidence was an error of constitutional magnitude; however, under the facts, its admission was harmless and does not require that the defendant's conviction be reversed. An error of constitutional magnitude is serious and may not be held to be harmless

unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. White*, 246 Kan. 28, 37, 785 P.2d 950, *aff'd as modified* 246 Kan. 393, 789 P.2d 1175 (1990). To make this determination, we must review the statements and the other evidence of the defendant's guilt. Johnson-Howell points out that when determining if the admission of the statements was harmless error, we must consider the fact that the jury requested, and received, a readback of Clemons' testimony.

First, we note that Clemons' statements regarding the rental car were corroborated by other witnesses called by both parties and by the testimony of Johnson-Howell. There is no prejudice resulting from admitting Clemons' statements as to the rental car.

That leaves the sole statement that Clemons knew Howell had been murdered. This single statement did not inculpate either Johnson-Howell or Clemons. In light of the length of the trial and the other evidence adduced, that statement cannot be viewed as having any effect on the outcome of the trial.

Johnson-Howell's final claim on this issue is that even though the court sustained the defense's objection when the State sought to have the detective testify that Clemons said he would do anything for the defendant, the State introduced the relationship into evidence through inference when the prosecutor asked Clemons if he had told the detective he would do anything for the defendant. Clemons did not answer the question.

We disagree with the defendant's assertion. During the trial, to show the relationship between the defendant and Clemons, the State introduced evidence that prior to Howell's death Clemons and the defendant had traveled together to Dallas, New Orleans, and Las Vegas. A photograph showing the defendant in a negligee was recovered from the search of Clemons' bedroom. In addition, there was evidence that the defendant and Clemons were in contact after the murder. The State introduced evidence that while Clemons was in the Johnson County jail, approximately 1,747 collect phone calls were placed to Johnson-Howell's resi-

dence and place of business from phones set aside for use by prisoners. Several witnesses testified about the relationship between Clemons and the defendant during the trial.

In *State v. Lomax & Williams*, 227 Kan. 651, the improperly admitted hearsay statement identified the defendant as one of the three individuals who had committed the robbery. In *State v. Myers*, 229 Kan. 168, during Myers' trial the hearsay statement admitted indicated that Myers had participated in the killing of the victim. Here Clemons' hearsay statements did not directly connect the defendant with the killing of her estranged husband, and the same information was introduced through the testimony of other witnesses. Even though the admission of Clemons' statements violated the defendant's constitutional right to confront the witnesses against her, under the circumstances, the introduction of the statements were harmless error and did not deprive the defendant of a fair trial.

*Violation of the Federal Wiretap Statutes*

The defendant filed a motion to suppress introduction of the tape-recorded conversation between herself and Frank Parker. Johnson-Howell asserted that the admission into evidence of the tape-recorded conversation violated the federal wiretap statutes, which prohibit the use in any trial of communications intercepted in violation of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 (1988) (Title III). The State argued that to have a violation of the federal wiretap statutes the interception must be willful.

The trial judge denied Johnson-Howell's motion to suppress the taped phone conversation recorded by Howell before his death. The trial judge found that at the time of the recording, Howell and Johnson-Howell shared a residence and both had joint control of the facilities in the residence where the recording was made. The judge noted that there were two phone lines and Howell was a subscriber on both lines. The judge found that in March 1989 Howell installed a voice-activated answering machine on a basement telephone line extension because he felt he was not receiving his telephone messages. In May 1989, Howell checked his messages and discovered a recording of a conversation between

Johnson-Howell and her secretary, Frank Parker. Johnson-Howell does not challenge these findings. Findings of fact by the trial judge which are not appealed are final and conclusive. *Sullivan, Bodney & Hammond, P.C. v. Bodney*, 16 Kan. App. 2d 208, 209, 820 P.2d 1248 (1991).

18 U.S.C. § 2515 (1988), prohibits, *inter alia*, the use of evidence in state court criminal proceedings if the evidence was obtained through unauthorized interception of an oral communication in violation of Title III. The unauthorized interception must be intentional. 18 U.S.C. § 2511(1)(a) (1988); see *United States v. Ross*, 713 F.2d 389, 391 (8th Cir. 1983). The party claiming a violation of Title III has the burden to show such violation. See, e.g., *United States v. Ross*, 713 F.2d at 391. Interception is defined as "the aural or other acquisition of the contents of any . . . oral communication through the use of any electronic . . . device." 18 U.S.C. § 2510(4) (1988). An electronic device includes "any device or apparatus which can be used to intercept a[n] . . . oral . . . communication." 18 U.S.C. § 2510(5). An extension phone is not a device under the statute. 18 U.S.C. § 2510(4)(a); *Simpson v. Simpson*, 490 F.2d 803, 809 (5th Cir.), *cert. denied* 419 U.S. 897 (1974).

In *United States v. Harpel*, 493 F.2d 346 (10th Cir. 1974), and *United States v. Cheely*, 814 F. Supp. 1430 (D. Alaska 1992), two federal courts have found recordings are not necessarily covered under Title III where the recording device merely records a conversation that has already been intercepted. The *Cheely* court opined that recording a phone conversation would be a violation only "if the conversation could not have been heard by the human ear listening to the same telephone." 814 F.Supp. at 1441. If Howell had listened in on the basement telephone extension, he would have heard the same conversation recorded by the answering machine.

In *Harpel*, the 10th Circuit Court of Appeals stated that a recording device placed next to, or connected with, a telephone receiver cannot itself be the "acquiring" mechanism. It is the receiver which serves this function—the recorder is a mere accessory designed to preserve the contents of the communication. 493 F.2d at 350.

Although Howell was not staying at the house at the time he installed the answering machine and when the tape was made, he retained joint control with Johnson-Howell over the premises. The trial court found Howell's purpose in installing the answering machine was to ensure he would receive his phone messages, not to record his wife's conversations with third parties. The defendant has failed to meet her burden of showing that her estranged husband had intentionally sought to intercept her oral communication. Under these circumstances no violation of federal law occurred, and the tape was admissible into evidence.

*Denial of the Right to Present A Defense*

Johnson-Howell asserts the refusal to permit her testimony regarding her interview with the police and the refusal to admit a letter denied her the right to have a meaningful opportunity to present a complete defense. The State argues the standard of review on admissibility or exclusion of evidence is whether the excluded evidence is relevant and material and whether the trial court abused its discretion in refusing to admit the evidence.

The defendant claims that the trial judge abused his discretion by failing to allow her to present evidence relevant to her defense and that the denial of her right to present this evidence diminished her constitutional right to present a defense.

The defendant's right to present a defense is subject to the rules of evidence and the case law. *State v. Thomas*, 252 Kan. 564, 573, 847 P.2d 1219 (1993). The standard of review for a claim of improper exclusion of relevant evidence is whether the trial court abused its discretion in excluding the testimony. *State v. Walker*, 252 Kan. 117, 133, 843 P.2d 203 (1992).

After Johnson-Howell testified, the State questioned her on matters omitted from her interview with police the day after the homicide, as well as on the fact that she terminated the interview on her attorney's advice. On redirect, she testified she was "a bit hysterical and somewhat withdrawn, and I don't know" at the time of the interview because her husband had been murdered the day before. She also stated the officers told her that her life had been threatened by Howell's friends and "perhaps Sam or Gilbert Dowdy," alleged to be "Kansas City drug kingpins." The State

objected, arguing that this line of questioning violated a pretrial motion in limine. The defense responded that the State had opened up the subject by bringing out "one detail or two details" regarding her interview with the police and leaving out information that would show that Johnson-Howell "was an emotional wreck" when the interview was terminated. The defense claims that the excluded evidence was relevant to defendant's state of mind and composure during the interview with the police and would have explained her omission of certain information during the interview.

We have reviewed the record and determined that the judge did not prevent Johnson-Howell from pursuing this line of questioning. The judge stated:

"I'll certainly allow you to allow her to explain if she felt she was upset at the time the interview took place, . . . but any innuendo that—trying to bring in somebody else committed the crime, there's no foundation for that at this time."

The defense then chose not to follow this line of questioning by laying a foundation but instead directed its attention to a letter defendant wrote to Oprah Winfrey and then to the tape recording of Johnson-Howell's conversation with Parker. Under the facts, the evidence was not excluded by the judge; the judge required the defendant to lay the foundation for the admission of the evidence. To require a defendant to lay a foundation for the admission of evidence is not an abuse of discretion.

The State introduced a letter Johnson-Howell wrote to Oprah Winfrey. The defense attempted to introduce a second letter written by Johnson-Howell to Winfrey. The State objected to the admission of the second letter, claiming that it was written with the intent to attack the victim's character, was self-serving, and lacked relevance. The judge sustained the objection, finding the letter was self-serving. The judge noted he would admit the letter if a proper foundation was laid.

Johnson-Howell argues that the State's objection to the admission of the letter because it was self-serving was not a proper objection in that most evidence adduced by a party is self-serving or prejudicial to the other party. On appeal, the State concedes there is no rule in Kansas prohibiting the introduction of self-

serving evidence and, instead, argues that the judge's ruling should be affirmed because the letter was hearsay.

In *Schmeck v. City of Shawnee*, 232 Kan. 11, 34, 651 P.2d 585 (1982), it was noted that there is no rule of evidence per se to exclude a letter as a self-serving statement. The court recognized that a self-serving statement may be excluded as hearsay. Defendant's letter, though hearsay, would have been admissible under 60-460(a) as a previous statement of a person present and available for cross-examination.

A review of the record shows that the court initally prohibited Johnson-Howell from attempting to introduce the letter but required that a proper foundation be laid before the evidence would be submitted for the jury to consider. Johnson-Howell could have attempted to lay a foundation for admission of the second letter but did not.

*The Effect of Cumulative Errors*

Johnson-Howell contends that in addition to the errors she previously raised in the appeal, there were numerous other prejudicial instances that cumulatively denied her the right to a fair trial. Johnson-Howell asserts "the State repeatedly stepped over the line of fairness." The specific instances she cites are:

1) the calling of Clemons' parole officer to testify regarding his lack of employment, and, in doing so, repeatedly stressing that the witness was a parole officer even though the court instructed the State to limit its questioning to Clemons' employment and not his probationary status (over a string of 17 questions, the State prefaced 4 with a reference to the witness' capacity as a Missouri State Parole Officer);

2) the introduction of evidence that Clemons had previously been arrested for carrying a concealed weapon, a handgun, and the introduction of a handgun that Johnson-Howell owned (the relevance of Johnson-Howell's possession of a handgun is questionable; however, Clemons' arrest occurred while he was driving a car rented by Johnson-Howell, which makes the circumstances sufficiently similar to the crime charged to establish relevance);

3) following up an expert's testimony that Clemons' jacket had no blood on it with a hypothetical question that shooting someone would not necessarily result in blood being deposited on the shooter's clothing (the expert's answer was that there would be too many variables involved to be able to answer the question);

4) asking Johnson-Howell whether she was familiar with Henry Arbrought's convictions, even though no evidence of the same was introduced;

5) improper argumentative examination of Johnson-Howell's hairdresser on whether the motive behind a hair appointment was to establish an alibi for the defendant (this objection was sustained); and

6) prosecutorial misconduct in closing argument by the State's heavy focus on Clemons' background and reference to matters not in evidence (this objection also was sustained); the prosecutor's reference to what the "big, bad defense" had to prove; and, finally, repeated references to Clemons' refusal to testify.

Johnson-Howell argues this case is based on circumstantial evidence and the evidence is "hardly overwhelming." The State contends that although the evidence was circumstantial, the evidence of guilt was overwhelming. This court has recognized that in some cases circumstantial evidence can provide overwhelming evidence of guilt. See *State v. Henderson,* 226 Kan. 726, 736, 603 P.2d 613 (1979) (under harmless error analysis, "the totally circumstantial evidence presented against the accused . . . of guilt was *not overwhelming, to say the least*" [emphasis added]); *State v. Coe,* 223 Kan. 153, 164, 574 P.2d 929 (1977) ("in view of the overwhelming circumstantial evidence disclosed in the record, the limitation placed on [the witness'] testimony concerning his use of marijuana the night of the alleged confession was harmless error"); *State v. Harding,* 208 Kan. 882, 884, 494 P.2d 1122 (1972) (noting the "trial court found the defendant guilty as charged and referred to the circumstantial evidence against the defendant as overwhelming").

The evidence, in a nutshell, was that Johnson-Howell had two motives for wanting Howell killed: revenge for his physical beating of her and financial gain from death benefits, insurance, and marital assets that would not then be subject to division in the divorce action. She had an emotional and physical relationship with the individual who murdered her estranged husband. The car Clemons was driving the morning of the homicide was seen in the vicinity of the homicide. Johnson-Howell and Clemons drove out to Howell's neighborhood the night before the homicide. Defendant was in a position to know that Howell was home that morning. A search of Clemons' apartment turned up shotgun ammunition similar to the type used to kill Howell. Boot tracks of the type of boot that Clemons could have owned while in the military were found leading to and away from where Howell's body was found. Although testimony indicated Clemons possessed a shotgun and could have possessed the type of boots involved, a search of the apartment turned up shotgun shells and a variety of other military clothing and equipment, but no sign of the two real incriminating pieces of evidence—the boots or the shotgun.

The cumulative effect rule is that trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *Taylor v. State*, 251 Kan. 272, 284, 834 P.2d 1325 (1992). The admission of Clemons' statements and the reference in closing argument by the State to the "big, bad defense" were trial errors. However, the cumulative effect rule does not apply where the evidence is overwhelming against the defendant. *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

A defendant in a criminal case is entitled to a fair trial, not a perfect one. *State v. Chandler*, 252 Kan. 797, Syl. ¶ 3, 850 P.2d 803 (1993). In light of the trial record as a whole, the errors, when viewed together, do not show Johnson-Howell was substantially prejudiced or denied her right to a fair trial. We can declare beyond a reasonable doubt that the trial errors had little, if any, likelihood of changing the results of the trial.

Affirmed.