No. 75,862

STATE OF KANSAS, *Appellee,* v. MICHAEL P. DAVIDSON, *Appellant.*
(954 P.2d 702)

Opinion filed March 6, 1998.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*K. Michael Warner*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Michael Davidson appeals his conviction for one count of first-degree murder and his sentence of life imprisonment, claiming the trial court erred in (1) informing the jury that he was wearing a leg brace at trial in order to prevent escape; (2) failing to grant a defense motion for mistrial; and (3) sustaining the State's objection to testimony regarding the deceased's reputation for violence.

On Sunday, February 12, 1995, Geraldine Bailey reported to the Olathe, Kansas, police department that her son, Al "Shalamar" Harris, had been missing since February 7, 1995. Shalamar was acquainted with the defendant, Michael Davidson, and Michael's wife, Cheri. Shalamar frequently sold crack cocaine from the Davidsons' house.

Detectives from the Olathe police department went to Davidson's house because they had information that Shalamar had last been seen at the Davidson residence. After Davidson told several stories regarding Shalamar's whereabouts, officers suspected Davidson's veracity.

On April 12, 1995, Shalamar's body was discovered on a farm in Miami County, Kansas. Despite its state of decomposition, the re-

moval of the left leg and right foot from the torso, and the fact that the body had been partially burned after death, the body was identified as Shalamar's by a forensic odontologist using dental x-rays. Shalamar had sustained seventeen injuries, including stab wounds, gunshot wounds to the head and neck, and multiple blows with blunt and sharp objects causing crushing injuries to the head and jaw. Although Shalamar's death was a homicide, the pathologist could not determine which of the 17 injuries was fatal. Evidence gathered at the scene included a sledgehammer, a burned tarp, Coleman fuel cans, and four spent 9mm cartridges.

Eric Dodson, Davidson's neighbor, talked to police after discovery of the body was reported in the news media. Dodson told the officers and later testified at trial that when he asked Davidson about Shalamar's whereabouts, Davidson answered he "took care of him." On various occasions, Davidson told Dodson that on February 7, 1995, while Shalamar was smoking crack cocaine at Davidson's house, Davidson walked up to Shalamar and shot him in the back of the head. Davidson also told Dodson that when Shalamar attempted to escape, Davidson slashed Shalamar's throat with a knife, then put Shalamar in a bathtub and stood on Shalamar's chest until he stopped breathing. Davidson then placed Shalamar's body in the trunk of his car. Two or three days later, Davidson and a friend drove to Miami County. After the body was removed from the trunk, Davidson smashed Shalamar's head with a sledgehammer and then set the body on fire. At trial, Dodson testified that Davidson said he killed Shalamar to protect Cheri because Shalamar had told Davidson he was attracted to Cheri and wanted to have sex with her. Dodson also testified that he had loaned Davidson a P-85 Ruger and two full ammunition clips.

Dodson testified further that after the police found Shalamar's body, Davidson paged Dodson and told Dodson to say that he (Davidson) had killed Shalamar in self-defense. When Dodson informed police he had been paged by Davidson, the police arranged to have Davidson's paged conversations taped. After Dodson encouraged Davidson to turn himself in to the police, Davidson did so.

During an interview with police after his arrest, Davidson admitted that he had killed Shalamar. Davidson also told police that he had tried to get rid of incriminating objects such as furniture and the automobile because they were bloodstained. After confessing, Davidson took the police to where he had hidden his gun. Subsequent police investigation of the car, furniture, and the floorboards of Davidson's house revealed the presence of bloodstains. The auto dealer to whom Davidson had sold the car testified that Davidson said he had to sell it to keep out of jail.

In his videotaped confession admitted at trial, Davidson related the events surrounding the crime in detail. He told police that Shalamar kept frequenting his home despite Davidson's request to stop. The day of the killing, Shalamar said he was going to have sex with Cheri. Shalamar then told Davidson that he and Davidson were "going to have to get into it." After that statement, Davidson repeatedly asked Shalamar to leave. When Shalamar refused, Davidson retrieved a gun, concealed the gun in a pillowcase, placed the gun to the back of Shalamar's head, and pulled the trigger. When shot, Shalamar stood up, yelled, and came at Davidson swinging. After Davidson fired twice more, a friend, Tracy "Woody" Maddox, came out of a back room and struck Shalamar two or three times with a car jack. Davidson then stabbed and slashed Shalamar with a knife. Davidson and Woody then dragged the wounded Shalamar to the bathroom, put him in the bathtub, and filled the tub with water. Davidson stood on Shalamar's body and held Shalamar's head under water until Shalamar stopped kicking. Davidson and Woody then placed Shalamar's body in a tarp and put it in the trunk of Davidson's car. After 2 or 3 days, they took the body to a field in Miami County, poured lantern fuel on the body, and burned it. To keep Shalamar's body from being identified, Davidson stated he attempted to knock out Shalamar's teeth with a sledgehammer. At trial, Davidson claimed he was defending himself and had not planned to kill Shalamar. Davidson was convicted of first-degree premeditated murder.

## DISCUSSION

### I. LEG BRACE

The Johnson County Sheriff's Department requires all male defendants in custody to wear a leg brace under their slacks during

court appearances to prevent escape. The brace causes the individuals in custody to walk with a limp. During the trial, Davidson did not object to wearing the leg brace until the evidence had been submitted to the jury.

The first mention of the leg brace appears in the record late in the trial process, just prior to the instruction conference. The prosecutor, Michael Warner, believing that the jury may have felt sympathetic towards the defendant because of the limp, stated to the judge:

"MR. WARNER: You were going to instruct the jury, Your Honor, about the shackling.

"MR. LOEFFLER [defendant's attorney]: We would object to any mention of shackling to the jury.

"THE COURT: Well, I don't want to create error where none is necessary, but the jury has already been informed that Mr. Davidson has been in custody, so that is—usually the reason for not doing it is because in certain kinds of cases the jury doesn't know whether the defendant is in custody or not in custody. They frequently draw an erroneous conclusion from the presence of the leg brace, which frankly I haven't noticed in this case.

"Does the State have any thoughts on the matter? Do you care in this particular case whether the jury is informed?

"MR. WARNER: Yes. In any case where physical force is part of the crime charged, I think that jurors pick up a lot of things."

Based on the prosecutor's request, the judge then made the following comments to the jury:

"Prior to giving jury instructions, I want to make a note of one thing which occasionally arises and is often unexplained. If you'll recall, during either the opening statement or the voir dire examination, it was pointed out that Mr. Davidson is in custody, pending this trial. As part of the standard operating procedure of the Johnson County Sheriff's Department, the defendants who are in custody and are in trial are equipped with a leg brace which disables them from attempting to run. This is done in any case in which a defendant happens to be in custody.

"I mention that only for the purpose of indicating to you that it is not—the brace isn't there because of any disability of the defendant."

Davidson asserts that not only was he required to wear a leg brace in front of the jury over his objection, but the trial judge further compounded the problem by informing the jury that Davidson was in custody of the sheriff and was wearing a leg brace to prevent Davidson from escaping. Davidson's assertion is somewhat

tempered because the jury had been previously informed by defense counsel in opening statement that Davidson was in custody. Defense counsel directed the attention of the jury to the sheriff's deputies guarding Davidson in the courtroom and stated:

"These two gentlemen back here, they are jail guards. And just so everybody knows right up-front, Mr. Davidson is still in custody. Does anybody here feel that the fact that Mr. Davidson is in custody shows that he is guilty for some reason? (No affirmative response.)

"Does everybody understand that when you are charged with first-degree murder, you are usually in custody, that, really the determination on whether you are in custody or not is kind of how much money you have, can you make bail, can you come up with half a million dollars to get out. (General affirmative response.)"

In *Holbrook v. Flynn*, 475 U.S. 560, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986), a defendant held in custody complained that the noticeable deployment of additional uniformed security personnel during his trial with five codefendants deprived him of his constitutional right to a fair trial. The United States Supreme Court disagreed, but observed that faith in the adversary system and in jurors' capacity to adhere to the trial judge's instructions has never been absolute. It recognized that certain practices pose such a threat to the "fairness of the fact-finding process" that they must be subjected to "close judicial scrutiny." 475 U.S. at 568 (quoting *Estelle v. Williams*, 425 U.S. 501, 503-04, 48 L. Ed. 2d 126, 96 S. Ct. 1691 [1976]). It noted that in *Estelle*, where a defendant was forced to wear prison clothes when appearing before the jury, " 'the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment.' " (475 U.S. at 568 [quoting *Estelle*, 425 U.S. at 504-05]), and since no " 'essential state policy' " was served by compelling a defendant to dress in this manner (475 U.S. at 568 [quoting *Estelle*, 425 U.S. at 505]), the practice is unconstitutional.

In *Estelle*, the Court emphasized that a defendant may be prejudiced if he or she appears before the jury bound and gagged. It pointed out that not only is it possible the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but also the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. 425 U.S. at 505. The United

States Supreme Court in *Holbrook* nonetheless observed that in certain extreme situations, " 'binding and gagging might possibly be the fairest and most reasonable way to handle' a particularly obstreperous and disruptive defendant." 475 U.S. at 568 (quoting *Illinois v. Allen*, 397 U.S. 337, 344, 25 L. Ed. 2d 353, 90 S. Ct. 1057 [1970]); see *Estelle*, 425 U.S. at 505. The *Estelle* rationale is applicable to the use of a leg brace in this case.

This court recently addressed the same issue in *State v. Ninci*, 262 Kan. 21, 936 P.2d 1364 (1997). In *Ninci*, just before opening statements began, defense counsel objected to the defendant's required leg brace on the grounds that it alerted the jury to the fact that the defendant was in custody. The trial court declined to "involve itself in the control of prisoners by the deputies" and noted that the brace was unobtrusive. 262 Kan. at 52.

Ninci appealed, alleging that physical restraint violated his right to a fair trial because the brace so inhibited his mobility that the jury was aware that he was restrained when he was required to move around in the presence of the jury. Ninci, citing *Estelle*, 425 U.S. at 503, and *Holbrook*, 475 U.S. at 570, argued a defendant has a right to appear before a jury free of restraints because such restraints present an unacceptable risk of prejudice and compromise the presumption of innocence.

The extent of physical movements Ninci was required to make in front of the jury was not clear from the record in the case. The *Ninci* court observed that the defendant has the burden of furnishing a record showing prejudicial error occurred in the trial and that absent such a record, the reviewing court assumes the trial court's action was proper. 262 Kan. at 53 (citing *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 [1989]). The *Ninci* court noted that there was no evidence that the jury knew the accused was wearing a leg brace, had detected the limp, or was aware the limp was caused by a leg brace. The court found that since Ninci had failed to present evidence indicating the jury noticed the restraint, it was not inherently prejudicial. 262 Kan. at 54.

The State asserts that the trial court's statement to the jury promoted a fair trial because it prevented the jury from inferring that

Davidson had a bad leg which would have either disadvantaged him in a fight with Shalamar or made him believe he had to kill Shalamar in self-defense. Davidson argues that the trial judge's statement was an instruction to the jury that prejudiced his constitutional right to a fair trial. Davidson bears the burden of showing his substantial rights were prejudiced.

Where a trial error deprives a defendant of a constitutional right, the standard to be applied is more stringent than simply whether there is a reasonable probability of a different result. Instead, the presumption is that the error warrants reversal unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt; that is, whether the court can say beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. See *State v. Johnson-Howell*, 255 Kan. 928, 944-45, 881 P.2d 1288 (1994). A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. *State v. Nguyen*, 251 Kan. 69, Syl. ¶ 5, 833 P.2d 937 (1992).

Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, is the principle that "one accused of a crime is entitled to have guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 56 L. Ed. 2d 468, 98 S. Ct. 1930 (1978). Whenever a courtroom arrangement is challenged as inherently prejudicial to a criminal defendant, the question is not whether jurors actually articulate a consciousness of some prejudicial effect, but rather whether there exists an unacceptable risk of impermissible factors influencing the jury.

We first emphasize the judge's remark that the sheriff's purpose for using the leg brace was to prevent an individual in custody from escaping served no legitimate purpose in the trial. The statement was not a jury instruction, but rather a judicial comment; therefore, the issue is one of judicial misconduct rather than of an improper instruction to the jury. Allegations of judicial misconduct during

trial must be decided on the particular facts and circumstances surrounding the alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party.

Control of an individual in custody from the jail to the courtroom and from the courtroom to the jail is the responsibility of the sheriff. All defendants have the right to appear before the jury free of restraints because such restraints present an unacceptable risk of prejudice and compromise the presumption of innocence. It is the judge's responsibility to insure that the defendant receives a fair trial. In extreme situations, a particularly obstreperous and disruptive defendant may be ordered to be restrained in the courtroom by the judge.

Neither the sheriff nor the trial judge, consistent with the Fourteenth Amendment due process or equal protection requirements, can compel all persons in custody to stand trial before a jury to wear a leg brace to prevent escape. Here, Davidson was prejudiced because the trial judge's comment emphasized that the purpose of the leg brace was to prevent escape. This is disturbing because it implied that an accused in custody of the sheriff is more apt to flee than an accused free on bond. The trial judge's surrender of the control of the courtroom to the sheriff and the judge's comments as to the reason the defendant was wearing a leg brace were error. However, the defendant's failure to object is normally sufficient to negate the presence of compulsion necessary to establish a constitutional violation. *Estelle*, 425 U.S. at 512-13.

Here, the evidence of Davidson's guilt is overwhelming. In his taped confession, Davidson admitted that he obtained a gun a few days prior to the shooting. He stated that when Shalamar refused to leave Davidson's residence, he approached the unarmed Shalamar with a gun hidden in a pillowcase and fired at the back of Shalamar's head. He admitted that he shot at Shalamar two more times, slashed his throat with a knife, and then dragged Shalamar's body to the bathtub, where he ran water in the tub and then stood on the body until Shalamar stopped kicking. Davidson then related to police that he wrapped the body in a tarp, placed it in the trunk

of a car, transported the body to Miami County, burned it, and finally smashed the skull with a sledgehammer. Moreover, Eric Dodson also testified that Davidson admitted the events to him.

In addition, here the jury was properly instructed on the presumption of innocence, and each juror took an oath to try the case on the law and the evidence presented at trial. Furthermore, since defense counsel had previously informed the jury that Davidson was in custody, the judge's statement was merely cumulative. Under these circumstances we declare that the judge's comment to the jury was harmless beyond a reasonable doubt.

Davidson also asserts that the judge's statement to the jury deprived him of his self-defense claim. In order to rely on self-defense, a person must have a belief that the force used was necessary to defend themselves and, also, show the existence of facts that support such a belief. *State v. Childers*, 222 Kan. 32, 48, 563 P.2d 999 (1977). The jury was instructed: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

The jury was also instructed on when the use of force in self-defense is justified:

"A person who initially provokes the use of force against himself is not justified in the use of force to defend himself unless:

1. He has reasonable ground to believe that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the other person."

Here, it was uncontroverted that Davidson was the initial aggressor against an unarmed victim and that he was not under any imminent threat from Shalamar. The jury was instructed that it was to presume Davidson was innocent, and the State had the burden of proving Davidson guilty beyond a reasonable doubt. After reviewing the record, we can say without any doubt that the judge's erroneous comments to the jury had little, if any, likelihood of changing the result of the trial.

## II. MISTRIAL

Originally, Davidson and his codefendant, Woody Maddox, were to be tried together. The cases were severed because the State intended to introduce into evidence each defendant's mutually inculpatory confession. In Davidson's trial, Maddox was called as a witness by the defense. Maddox asserted his Fifth Amendment right not to testify.

Davidson argues that the trial court violated his constitutional right to a fair trial by denying his motion for mistrial based upon allegedly prejudicial comments concerning Maddox made by the prosecutor during opening statement that tended to incriminate Davidson. In his opening statement to the jury, the State's counsel commented on Maddox's joking and callous attitude after the murder, stating:

"After the New Year or start of 1995, Tracey—or Woody—Maddox moved into the Davidsons' house. As testimony will show, he is physically smaller than the defendant. He will be described by others as a quiet, somewhat passive person, apparently quite devoted to the defendant, although the testimony will also show that Woody Maddox, after the murder of Shalamar, joked about it in the presence of Cheri Davidson and joked one time about Shalamar's body still being in the trunk of the Monte Carlo out in the driveway one day when Shalamar's family came by asking about where he was."

At the end of the prosecution's opening statement, defense counsel approached the bench to inquire whether the State had a deal worked out for Maddox to testify in the case. The State admitted that Maddox would not testify. The defense then objected to the introduction of Maddox's hearsay statement and moved for a mistrial, claiming that the absent witness' statement implicated Davidson and violated Davidson's Sixth Amendment right of confrontation, even if a curative instruction were given.

Davidson moved for a mistrial, asserting that Maddox's hearsay statement tended to implicate him in the death of Shalamar. Davidson claimed his Sixth Amendment right to confront witnesses was violated because Maddox did not testify at trial. The prosecutor asserted that opening statements are not evidence, and the trial court offered to give the jury a curative instruction to disregard the statement. The trial court took the matter on advisement and later

found the error in the prosecutor's opening statement to the jury to be harmless because there had "been no evidence presented in the form of testimony . . . concerning any out-of-court statements of Mr. Maddox."

On appeal, Davidson argues that he was prejudiced by the absent codefendant's statement because the inference sought by the State was that he manifested a "callous and jocular attitude about the death of Shalamar" and use of Maddox's remark by the prosecutor was calculated to inflame the passions of the jury and show premeditation.

The trial court may declare a mistrial when prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant. K.S.A. 22-3423(1)(c). The decision to declare a mistrial lies within the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of that discretion. *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 8, 807 P.2d 86 (1991). A party seeking a mistrial has the burden of showing that the party has been substantially prejudiced by the error. *State v. McClanahan*, 259 Kan. 86, 92, 910 P.2d 193 (1996).

It is noteworthy that similar evidence was introduced by the defendant during the testimony of Eric Dodson:

"Q: Do you recall Mike telling you something in this ten-day period about the body being in the trunk when Geraldine Bailey came by?

"A: Yes. He kind of laughed about it. He said that she was looking for her son through the house and through the other vehicle that Mike would loan him on occasion, but he said that she was standing right next to the car that he was in.

"Q: How did he tell this to you.

"A: He said that he was worried because the car was sitting so low to the ground he thought that she would notice and walk up to the trunk.

"Q: When he related this incident to you, what was his demeanor or how did he tell you this.

"A: seemed like his regular demeanor, a little jokingly."

In addition, Cheri Davidson, a defense witness, testified that after Geraldine Bailey left the house, Davidson was joking with Maddox.

The jury was instructed that statements of counsel are not evidence and any statement not supported by the evidence should be disregarded. A jury is presumed to have followed a court's instructions that the case be solely decided on the evidence presented.

See *State v. Logan*, 236 Kan. 79, 84, 689 P.2d 778 (1984). The trial court did not err in denying Davidson's motion for mistrial. Even if error, the error was harmless in view of the overwhelming evidence of Davidson's guilt and had little, if any, likelihood of changing the result of the trial.

## III. CHARACTER EVIDENCE

Davidson argues his due process right to a fair trial was violated because the court "excluded evidence of the deceased's reputation for and propensity for violence" by not allowing Davidson to cross-examine Eric Dodson, a State's witness, as to specific instances of Shalamar's violent conduct.

Where self-defense is an issue in a homicide case, evidence of the turbulent character of the deceased is admissible. Such evidence may consist of the general reputation of the deceased in the community, but specific instances of misconduct may be shown only by evidence of a conviction of a crime. *State v. Deavers*, 252 Kan. 149, 156-57, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993).

The scope of cross-examination is a matter within the sound discretion of the trial court. *State v. Vargas*, 260 Kan. 791, 798, 926 P.2d 223 (1996). Questions asked on cross-examination must be responsive to testimony given on direct examination, or material or relevant thereto. Resolution of whether a party exceeded the permissible scope of cross-examination rests within the sound discretion of the trial court and the trial court will not be reversed unless that discretion is abused. *State v. Gadelkarim*, 256 Kan. 671, 682, 887 P.2d 88 (1994).

Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Spresser*, 257 Kan. 664, 667, 896 P.2d 1005 (1995).

Davidson argues that "[t]he confusion surrounding the admissibility of the evidence concerning the deceased's reputation, as

well as exclusion [of] evidence concerning specific acts of violence by the deceased, prevented the defense from effectively cross-examining the witness and from presenting a defense." After review of the record, we find that Davidson's assertion that the trial court improperly "excluded evidence of the deceased's reputation for and propensity for violence" during cross-examination of Eric Dodson is incorrect. Actually, the trial court merely sustained the prosecution's objection as to foundation during defendant's cross-examination of Dodson. It was defense counsel's decision to abandon the inquiry after the trial court sustained the prosecution's foundation objection and to not call Dodson as a witness in the defense's case in chief.

The record is clear that Davidson presented his self-defense theory to the jury. The trial court instructed the jury on self-defense. The court did not exclude all evidence of Davidson's theory. The trial court did not abuse its discretion; Davidson could have pursued this line of questioning by later calling Dodson as a defense witness.

Affirmed.