(192 P.3d 673)
No. 96,602

STATE OF KANSAS, *Appellee*, v. PHILLIP ANDERSON, *Appellant*.

Opinion filed September 26, 2008.

*Randall L. Hodgkinson* and *Patrick A. Turner*, legal intern, of Kansas Appellate Defender Office, for appellant.

*Robert A. Walsh*, county attorney, and *Paul J. Morrison*, attorney general, appellee.

Before MCANANY, P.J., HILL, J., and LARSON, S.J.

MCANANY, J.: On April 12, 2005, Phillip L. Anderson and his girlfriend, Donna, met with Amber Fellows, a support worker for Family Preservation Services, to discuss Donna's children. Anderson and Donna had traveled to the meeting in Anderson's truck. Since Anderson's driver's license was suspended at the time, Levi McCuistion, a friend of Anderson, drove the truck and remained behind while Anderson and Donna attended the meeting. When Fellows stated at the meeting that the Kansas Department of Social and Rehabilitation Services (SRS) had taken emergency custody of Donna's children, Anderson began to yell and curse. He threatened to bomb SRS, to kill an SRS employee, and to kill the person who was caring for the children. Anderson and Donna left, carrying a camouflage jacket. Fellows called the police.

The police located and stopped Anderson's truck. McCuistion was asked to get out of the truck, but he was not searched. When questioned about the events earlier that day, Anderson denied he had made any threats. Nevertheless, the police arrested him and placed him in a patrol car. Sergeant Voekler then searched Anderson's truck and found the camouflage jacket and drugs and paraphernalia in one of its pockets. Donna said the jacket was hers. However, when Anderson saw Sergeant Voelker with the jacket, he shouted from the patrol car that the jacket was his. He later testified he claimed the coat was his because, "I didn't want Donna to go to jail. I wanted to keep her out so she could go get the kids

because I knew that's all that matters to her." The police arrested both Donna and Anderson.

The State charged Anderson with criminal threat, possession of methamphetamine, possession of marijuana, and possession of drug paraphernalia.

Anderson was taken to court in shackles for his jury trial. After voir dire, the following exchange took place in chambers between counsel for Anderson and the court:

"[Counsel]: Your Honor, there is one thing. My client—I don't know the reason why —[he] is in manacles around his ankles. I prefer that that not be the case.

"THE COURT: I understood. And you told me that in the recess. And my longstanding policy has been that the guys that would have to do the work — potentially have to do the work are going to make the call. So Randy said he would prefer to have them on. So for that reason the motion is denied.

"[Counsel]: Okay. I understand that. Is there a reason --is he a flight risk? Did he give a reason or did he just say I prefer to have them on?

"THE COURT: The latter.

"[Counsel]: He just wants them on?

"THE COURT: That's what he said."

Anderson remained shackled for the duration of the trial.

Ownership of the camouflage jacket containing the drugs and paraphernalia was disputed. Sheriff Larry Bergstrom testified that on March 25, 2005, about 3 weeks before this incident, he had seen Anderson in a camouflage jacket similar to the jacket found in Anderson's truck when he was arrested.

Kama Naumann testified that she had been living with Anderson prior to April 6, 2005. Before she left, Naumann discovered that her college ID was missing. The ID was later found in the pocket of the jacket taken from Anderson's truck. She recalled Anderson wearing a camouflage jacket, but it was brighter and newer than the one apparently found in Anderson's truck.

Holly Brown, a coordinator for Big Brothers Big Sisters of Cloud County, testified that on the day of the incident Anderson and Donna came into the office and one of them, she did not remember which, was wearing a camouflage-type military jacket. Anderson was carrying the jacket when they left.

Donna testified that the camouflage jacket belonged to Mc-Cuistion and she had seen him wearing the jacket on the day of

Anderson's arrest. Casey Zach, a friend of Anderson's, testified that he had seen McCuistion wearing the jacket that day and never saw Anderson wear it. Another friend of Anderson's, Teresa Cada, also testified that she had seen McCuistion wearing the jacket.

Anderson testified that the camouflage jacket and the drugs were not his. He claimed he admitted to the police at the scene of his arrest that the jacket was his solely to prevent Donna from being arrested. He testified that the jacket belonged to McCuistion. On cross-examination, Anderson was asked about whether he had co-ordinated his testimony about the jacket with Zach. In doing so, the State referred to Zach and Anderson having been cell mates. The district court overruled Anderson's objections to this reference to Anderson having been in jail and denied Anderson's request for a mistrial.

The jury found Anderson guilty on all four counts. The district court denied Anderson's motion for new trial or judgment of acquittal and sentenced him to a term of probation with an underlying prison sentence. This appeal followed.

Anderson first challenges the district court's order that he be shackled throughout the trial. Kansas courts have long held that a defendant in a criminal case should not be tried while in handcuffs or shackles except in exceptional circumstances. The exceptional circumstances justifying their use must be clear from the record. If it is not apparent from the proceedings themselves, such as a disruption of the trial or other obvious reasons, the district court should conduct a hearing and state its reasons for ordering the use of restraints. Shackles should be allowed during trial only when it is apparent that no other means will be effective. See *Holbrook v. Flynn*, 475 U.S. 560, 570-71, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986); *State v. Williams*, 228 Kan. 723, 730-31, 621 P.2d 423 (1980).

On review, we examine the district court's order that the defendant be shackled during the trial using the abuse of discretion standard. *State v. Powell*, 274 Kan. 618, 626-27, 56 P.3d 189 (2002); *Williams*, 228 Kan. at 731.

*Powell* is instructive in considering this claim. There, the sheriff testified as to his reasons for wanting the defendant to wear a stun

belt. Powell was a prior offender charged with capital murder. While incarcerated, Powell made a homemade weapon and stabbed an inmate five times. On another occasion prison guards found a toothbrush sharpened to a point and hidden in Powell's shampoo bottle. Powell had been placed in segregation numerous times. Powell had been removed from the courtroom for disruptive conduct in a previous case. He was a threat to the safety of the public and to the court. Further, the use of the stun belt was not obvious to jurors. They would be aware of its presence only if specifically brought to their attention. The stun belt was neither activated during Powell's trial nor was it pointed out to the jury.

In finding no abuse of discretion, the *Powell* court listed the factors to be considered when determining whether a defendant was properly restrained during trial:

"the background of the defendant; the nature of the charges; evidence of dangerous incidents; testimony about the restraints sought to be used; prior conduct of the defendant; the objection to use of the restraint and/or the election by the defendant whether to testify; the physical facts of the individuals and the courtroom; the presence or absence of victims, family, or spectators; and other factors that will vary from case to case must be considered by the trial court." 274 Kan. at 637.

Here, it is impossible to review this case using the abuse of discretion standard since the district court failed to exercise its discretion. It simply deferred to the wishes of the jailer. The nature of judicial discretion was discussed in *State v. Foren*, 78 Kan. 654, 658-59, 97 P. 791 (1908):

"Discretion is the freedom to act according to one's judgment; and judicial discretion implies the liberty to act as a judge should act, applying the rules and analogies of the law to the facts found after weighing and examining the evidence—to act upon fair judicial consideration, and not arbitrarily."

As stated in *Shopiro v. Shopiro*, 153 P.2d 62, 66 (Ca. App. 1944), "Legal discretion . . . means nothing more than the application of statutes and principles to all the facts of the case." See *Saucedo v. Winger*, 252 Kan. 718, 730, 850 P.2d 908 (1993).

Rather than exercising judicial discretion in considering Anderson's request that the shackles be removed, the district court deferred to the jailer and let him decide. The jailer's decision became

the court's decision, without analysis or application of the principles of law to the facts presented. As such, the district court clearly abused its discretion.

The State acknowledges that the shackles were apparent to the jurors deciding Anderson's innocence or guilt. Anderson was charged with criminal threat, that is, that he threatened violence with the intent to terrorize others. The presence of shackles clearly sent the message to the jury that here is a violent and dangerous man. The discretion to shackle Anderson throughout the trial was exercised without any proper analysis to support it. Under these circumstances, the use of shackles was inherently prejudicial. As stated in *Deck v. Missouri*, 544 U.S. 622, 635, 161 L. Ed. 2d 953, 125 S. Ct. 2007 (2005):

"Thus, where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' [Citation omitted]."

The State argues that we should not reverse because the error was harmless. Reversal is required here unless we are willing to declare that the error was harmless beyond a reasonable doubt; that is, unless we can conclude beyond a reasonable doubt that the error had little, if any, likelihood of changing the result of the trial. See *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967); *State v. Davidson*, 264 Kan. 44, 51, 954 P.2d 702 (1998).

The State argues that there was overwhelming evidence that Anderson spoke the threatening words at the meeting. Anderson testified in his own defense. He did not deny making the threats. He testified on direct examination that he was upset at the meeting. When asked about any statements he made to Amber Fellows, the Family Preservation Services worker, he answered, "I spouted off a lot and I shot my mouth off. I was upset. My girlfriend was crying, and they had taken her kids." On cross-examination he was not asked about the threats.

The court instructed the jury that to find criminal threat it had to find that Anderson threatened to commit violence with the in-

tent to terrorize others; that is, with the intent to reduce those to whom the statements were made to extreme fear or fear that agitates body and mind.

In closing argument, the State argued, "[W]as he kidding when he said that? . . . He was not kidding when he said that. He was angry. He meant it. And that's the focus you should have."

Anderson's counsel acknowledged in closing argument that Anderson had been "ranting and raving" at the meeting. He argued, however, that the crime of criminal threat had not occurred because Anderson was, essentially, blowing off steam and no one took him seriously. Counsel argued, "[W]ith the experience that these individuals had one would suspect that they knew enough that people say things they don't mean." He pointed out, "Intent, the burden never shifts to the defendant regarding that issue." He concluded his argument:

"My client doesn't deny making a lot of statements. And shooting his mouth off was his words. You'll have to decide whether or not under all the facts and circumstances of the case whether or not that truly was a criminal threat. And I'd ask you to find him not guilty on that count."

The jury had to determine whether Anderson was merely blowing off steam as his counsel argued or whether his conduct satisfied all the elements of the crime of criminal threat. In deliberating on these issues, the jury had before it the fact that Anderson had been in shackles throughout the trial, an indication that he was a violent person who could act in a violent manner even in the controlled environment of a formal court proceeding if not restrained.

Under these circumstances, and given the nature of this criminal threat charge, we cannot say beyond a reasonable doubt that the presence of the shackles had little, if any, likelihood of changing the result of the trial. Accordingly, we must reverse Anderson's conviction for criminal threat.

Anderson was also convicted of possession of methamphetamine, possession of marijuana, and possession of drug paraphernalia. The State argues that the evidence was so overwhelming with respect to these charges that the error in shackling Anderson without any legal or factual analysis was harmless.

The issue of possession of the drugs and the drug paraphernalia turned on possession of the camouflage jacket found in Anderson's truck. The evidence on that point was strong but not compelling. There was substantial evidence on both sides of the issue. Pursuant to *Deck* and *Chapman*, the State had the burden to prove beyond a reasonable doubt that the court's error in ordering Anderson to be shackled did not contribute to the verdict. The evidence of possession of the jacket was not so overwhelming for us to make so firm a conclusion. Accordingly, we are required to reverse Anderson's convictions on these drug and paraphernalia charges as well.

The resolution of this first issue renders Anderson's remaining claims moot.

Reversed.