No. 66,644

STATE OF KANSAS, *Appellee*, v. LAJUAN CLEMONS, *Appellant*.

(836 P.2d 1147)

Opinion filed July 10, 1992.

*Wendy Rhyne Slayton*, assistant appellate defender, argued the cause, and *Kay Messer*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*Thomas J. Bath, Jr.*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: LaJuan Clemons appeals his conviction and sentence for first-degree murder, K.S.A. 1989 Supp. 21-3401, a class A felony, claiming the trial court (1) failed to suppress his prior statements; (2) improperly allowed the State to strike a prospective juror who had expressed his concern that there were no minorities on the panel; (3) admitted illegally seized evidence; (4) improperly instructed the jury on aiding and abetting; and (5) illegally ordered payment of restitution after imposing incarceration. He also claims there was insufficient evidence for a rational factfinder to conclude he was guilty beyond a reasonable doubt.

Faye Howell was Charles Howell's estranged wife. Faye Howell had plotted over the telephone with others to kill Charles. Charles had recorded the telephone conversations. When he confronted Faye, things "cooled down." Their divorce was to become final the day Howell was murdered. Howell was shot twice in the head while outside his girlfriend's house where he was living in Olathe, Johnson County, Kansas, on February 8, 1990. One wound was caused by a shotgun slug and the second by a shotgun blast consisting of shotgun pellets.

Bobbi Bolton, Charles' girlfriend, testified she heard two gunshots outside her house at approximately 8:00 that morning. She went outside and found Howell fatally shot. She called 911 and told the dispatcher that Howell had been shot. Bolton also told the dispatcher she had observed a light blue four-door small to mid-size car, possibly a rental car, located on the street behind her house in an area which was under development and that a black person had been next to the blue car before the car fled from the area.

Police officers investigating the murder scene discovered footprints leading from the muddy area where the light blue car had been parked to Howell's body and a second set of footprints returning from the body to the car.

The police investigation revealed that Faye Howell and LaJuan Clemons, who are black, had rented a light blue four-door mid-size car from System One Rent-A-Car on the day before the homicide. They returned the car at approximately 11:00 a.m. on February 8, 1990, approximately three hours after Howell had been shot. The police obtained a search warrant and seized the car at noon the same day. A search of the car led to the discovery of a set of keys in the car and a fingerprint on the trunk. The car had mud on the driver's floorboard area. It was later determined the keys belonged to Clemons and it was his fingerprint on the trunk of the rental car.

Detectives from Olathe interviewed Clemons at his apartment in Missouri on February 9, 1990, at approximately 12:30 a.m. At the time the defendant was being interviewed, there were numerous other possible suspects in the homicide and 11 detectives working throughout the metropolitan area were following leads. Initially, Clemons identified himself as Nelson Brown and advised

the detectives that he knew LaJuan Clemons but had not seen him for at least one day. Eventually, he admitted he was LaJuan Clemons and indicated he and Faye Howell were lovers.

On February 11, 1990, police executed a search warrant at Clemons' residence and recovered two shotgun shells similar to the shells used to kill Charles Howell. On February 15, 1990, Clemons was arrested and charged with murder. Clemons was subsequently convicted by a jury of the murder of Charles Howell, sentenced by the trial judge to life imprisonment, and ordered to pay restitution in the amount of $1,000. On appeal, Clemons raises six issues.

I. Trial court refusal to suppress statements by Clemons.

Clemons first argues the interview at his apartment was a custodial interrogation in which he was not advised of his Fifth and Sixth Amendment rights. Clemons claims the trial court erred in finding he was not "in custody or otherwise deprived of his freedom of action" and in denying his motion to suppress the statements elicited from him during the interview. He concludes the error was not harmless but highly prejudicial and denied him a fair trial.

The preliminary hearing was held before Judge William G. Gray. There were two suppression hearings held by Judge John Anderson III. Trial commenced December 3, 1990, before Judge Anderson. After the State had presented its evidence, Clemons testified for the first time. Based on this testimony, Clemons claims the trial judge erred by not suppressing his prior statements.

A defendant in a criminal case has a constitutional right at some stage in the proceeding to object to the use of an allegedly involuntary confession and have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. *State v. Miles,* 233 Kan. 286, Syl. ¶ 3, 662 P.2d 1227 (1983).

Prior to the preliminary examination or trial, a defendant may move to suppress as evidence any confession or admission given by him on the ground that it is not admissible as evidence. If the motion alleges grounds which, if proved, would show the confession or admission not to be admissible, the court shall

conduct a hearing into the merits of the motion. The burden of proving that a confession or admission is admissible shall be on the prosecution. The issue of the admissibility of the confession or admission shall not be submitted to the jury. The circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing upon the credibility or the weight to be given to the confession or admission. The motion shall be made before the preliminary examination or trial, unless opportunity therefor did not exist or the defendant was not aware of the ground for the motion, but the court in its discretion may entertain the motion at the preliminary examination or the trial. K.S.A. 22-3215.

### EVIDENCE AT THE FIRST SUPPRESSION HEARING

On February 9, 1990, at approximately 12:30 a.m. detectives with the Olathe Police Department arrived at LaJuan Clemons' apartment in Kansas City, Missouri. The Olathe detectives were in plain clothes. Accompanying the detectives were uniformed Kansas City, Missouri, police officers. Defendant's roommate, Mark Smith, answered the knock on the apartment door and allowed the officers into the apartment. Smith indicated that LaJuan Clemons was in his bedroom. Two detectives entered the bedroom and observed the defendant fully clothed, including shoes, lying on top of the covers of his bed. It was the detectives' impression that the defendant was awake but acting as if he was asleep.

The detectives explained to Clemons that they were from the Olathe Police Department investigating a homicide and asked him if he would speak with them. Clemons indicated that he would. The detectives spoke with the defendant for approximately an hour and a half. During the interview Clemons was advised that he was not under arrest, and he indicated that he understood this. Clemons refused to allow the detectives to audiotape the interview.

Clemons then provided the police with conflicting statements. When the police asked defendant if he was Clemons, he responded that he was Nelson Brown. Clemons told the detectives he knew Clemons and that Clemons stayed in the apartment from time to time, but that he had not seen him for some time. When

the police confronted him with the fact that they knew who he was, he admitted he was Clemons. Clemons then denied he knew Charles Howell. He subsequently admitted he knew Howell and saw on the five o'clock news that Howell had been killed. Clemons initially stated he and Faye Howell were merely friends, then admitted that he was romantically involved with Faye Howell and would do anything for her. Clemons said he had not been in the blue rental car over the last couple of days, then later admitted that he had been in the blue car the day before the murder. In fact, he had driven the blue car to the exact area in Olathe where the car allegedly used by the murderer had been observed by witnesses shortly after the murder. When asked of his whereabouts at the time of the murder, Clemons said that Bill McCallup had given him a ride to the Independence courthouse to testify in the Howells' divorce hearing. He told the detectives that he did not know McCallup's phone number. When asked how McCallup knew to pick him up, Clemons said, "He just sort of shows up sometimes." Clemons later informed the detectives that Maria Speed had driven him to the courthouse that morning.

During the interview, the detectives requested defendant's consent to a search of his room. The detectives later testified Clemons was informed that he had a right to the presence of an attorney or he could consult one before he made a decision as to allowing the officers to search. Clemons signed a consent to search waiver and allowed the officers to search his room after the officers agreed not to disturb anything and allowed him to remain in the room during the search. A cursory search by the detectives revealed nothing to incriminate Clemons. When Clemons told the detectives he would not answer any more questions, the officers left the apartment. Clemons refused to accompany the detectives to Olathe for questioning.

## THE SECOND SUPPRESSION HEARING

After the defendant retained a different attorney, the district judge allowed the defendant a second suppression hearing. During the second suppression hearing, defense counsel argued the Fourth Amendment required that Clemons' statements be suppressed.

The only witness for the defense at the second suppression hearing was the defendant's roommate, Mark Smith. Smith testified that on February 9, 1990, at approximately 12:30 a.m., the police knocked on the apartment door. When he opened the door, the police walked, uninvited, into the apartment with drawn guns. Smith stated he told the detectives that the apartment was private property and that they could not go into Clemons' bedroom.

Smith further testified that LaJuan Clemons never used the name Nelson Brown to his knowledge. Smith then indicated that he did not know who Nelson Brown was. Smith testified that while the police were in the apartment he did not provide them with any information. Smith asserted he was coerced by the police officers to go to Olathe.

Detective O'Halloran of the Olathe Police Department was present at the defendant's apartment during defendant's questioning. Detective O'Halloran testified that after the police were invited into the apartment by Smith, he spoke at length with Smith concerning what Smith knew about Clemons. Detective O'Halloran testified that, contrary to Smith's testimony, Smith had provided them much information concerning the defendant's whereabouts on the day of the murder. Detective O'Halloran stated Smith told him that he (Smith) was afraid of the defendant and afraid that the defendant might find out that he gave information to the police. O'Halloran stated that at the end of the interview at the apartment, Smith began to cry as he told about his fear of Clemons. Smith asked O'Halloran for help to get out of the apartment and away from the defendant. O'Halloran informed the judge the conversation had been tape recorded.

The judge became so concerned that Smith's testimony was not credible, he called counsel to the bench and subsequently instructed Smith that if he was testifying falsely he could be found guilty of perjury, a class E felony. Smith later pled guilty to attempted perjury.

On appeal, Clemons contends that when interviewed by the police, he was in custody and should have been read his rights. Because he was not informed of his right not to be a witness against himself, as required by *Miranda*, the trial court should have suppressed his statements.

Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. *State v. Price*, 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990).

Prior to any custodial interrogation, a defendant must be warned of his or her constitutional rights. The determination of whether interrogation was custodial is made on a case-by-case basis. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him or her "in custody." An objective standard is used to judge whether an interrogation is custodial. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. *State v. Fritschen*, 247 Kan. 592, Syl. ¶¶ 1, 2, 802 P. 2d 558 (1990).

When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and knowingly given, and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence. *State v. Zuniga*, 237 Kan. 788, Syl. ¶ 3, 703 P.2d 805 (1985).

After conducting two suppression hearings and hearing the trial testimony, the trial judge found there was no evidence that Clemons was deprived of his freedom of action in any significant way when Clemons made the statements to the detectives. The trial court did not err in determining that the interview was not a custodial interrogation.

II. The strike of a prospective juror who expressed concern over the composition of the jury panel.

Clemons argues the State improperly used a peremptory challenge to strike a prospective white juror, Mr. MacDonald, who voiced his concern as to the absence of minorities on the jury panel. In explaining the strike, the prosecutor stated to the trial

judge, "The State's concern was that [MacDonald] could not follow the law and that his personal conscientiousness, his personal values would override what the court told him the law should be." The trial court accepted this explanation for the peremptory strike and denied Clemons' motion to re-seat MacDonald.

Clemons asserts the State's explanation is contrary to MacDonald's answers to the questions posed by both the court and the prosecutor. Clemons argues MacDonald was excluded from the jury panel because he was a socially conscious citizen who expressed concern over the racial makeup of the panel. Clemons claims that although the trial court admitted the juror was struck because of his statement, it held the State was not required to provide a race-neutral explanation for using a peremptory challenge to strike the prospective juror.

In *Batson v. Kentucky*, 476 U.S. 79, 96, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court considered a claim of impermissible purposeful race-based discrimination by the State through the use of peremptory challenges during jury selection. In that case, both the defendant and the excluded veniremen were black. The court held that the striking of black venirepersons on the basis of racial grounds or the belief that black jurors will be sympathetic to a defendant of their own race violates the Equal Protection Clause of the United States Constitution.

Under *Batson*, the burden of proof required of a criminal defendant to establish a prima facie case of impermissible purposeful discrimination by the State in the use of peremptory challenges during jury selection requires that the defendant be a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the venirepersons from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, or selection of the venire,

raises an inference of purposeful discrimination. *State v. Sledd,* 250 Kan. 15, Syl. ¶ 1, 825 P.2d 114 (1992).

As authority, Clemons cites *Powers v. Ohio,* 499 U.S. ___, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), which expanded the court's ruling in *Batson.* In *Powers,* a prosecutor, during the jury selection process for a white criminal defendant's Ohio homicide trial, exercised peremptory challenges to remove black venirepersons from the jury. The defendant objected, citing *Batson.* The trial court overruled the defendant's objections. The defendant was eventually convicted. On appeal, the Court of Appeals of Ohio, Franklin County, affirmed the defendant's conviction despite the defendant's contentions that (1) the prosecutor's allegedly discriminatory use of peremptory challenges violated the Equal Protection Clause; and (2) the defendant's own race was irrelevant to his alleged right to object to the prosector's peremptory challenges. The Supreme Court of Ohio dismissed the defendant's appeal, finding that the appeal presented no substantial constitutional question.

On *certiorari,* the United States Supreme Court reversed and remanded. It held that a criminal defendant may object to the race-based exclusion of jurors effected through a prosecutor's use of peremptory challenges regardless of whether the defendant and the excluded juror share the same race. It stated a same-race limitation on a defendant's right to object violates the substantive guarantees of the Equal Protection Clause and the policies underlying a federal criminal prohibition against discrimination in jury selection (18 U.S.C. § 243 [1988]). Under those guarantees and policies, a prosecutor is prohibited from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race. The United States Supreme Court determined that under such circumstances the defendant had standing to raise the equal protection claims of the excluded jurors.

*Powers* holds a prosecutor's wrongful exclusion of a juror by a race-based peremptory challenge is a violation committed in open court at the outset of the proceedings. 113 L. Ed. 2d at 426. A criminal defendant may object to race-based exclusions of jurors by a prosecutor's use of peremptory challenges whether or not the defendant and the excluded juror share the same race. 113

L. Ed. 2d at 419. Here, MacDonald's exclusion by the State was not race-based. Clemons' contention is without merit.

III. The admission into evidence of items seized in contravention of Faye Howell's Fourth Amendment rights.

Clemons argues that the police conducted a warrantless and illegal search of Faye Howell's home when they entered and seized the rental car agreement. Clemons asserts this violated Faye Howell's Fourth Amendment rights and uncovered vital evidence linking him to the crime. He argues that without the rental contract it was virtually impossible for the authorities to seize a nondescript small blue vehicle variously described by witnesses as a Chevy Nova, a Plymouth Acclaim, or a Dodge Spirit. Clemons claims that because Faye Howell's constitutional rights were violated the evidence was fruit of the poisonous tree and may not be used against him.

This issue was not raised at the trial court level in a motion to suppress or otherwise. Although ordinarily an appellate court will not consider an issue which has not been raised in the trial court, the court does have the power to do so in exceptional circumstances, as in this case, where consideration of the new issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights. *State v. Puckett*, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982).

Shortly after Charles Howell was shot to death, police went to Faye Howell's home. No one answered the door. Police noticed the back door was unlocked and went inside, apparently to check on the welfare of Faye and her son. Inside, on the kitchen counter, was a copy of a car rental agreement from System One Rent-A-Car. The police then went to System One and discovered Faye Howell and a black male had just returned the rented vehicle. The vehicle was seized and Clemons' keys and his fingerprint were subsequently found. The rental agreement was admitted into evidence at trial with no objection from the defendant.

Allen Robert Jaskiewicz, an employee of the System One rental car agency, testified at trial that at approximately 10:00 a.m. on February 7, 1990, Faye Howell and Clemons picked up a light blue rental car from System One. Karen Bly, also an employee

at System One, testified that on February 8, 1990, at approximately 11:30 a.m., Faye Howell and Clemons returned a light blue car which had been rented the previous day.

When Detective O'Halloran interviewed Clemons in Clemons' apartment, Clemons informed the detective that he had lost his keys and gave a description of the keys. At trial, the keys found in the rental car were identified by O'Halloran as being similar to the ones described by Clemons.

Clemons admits under traditional suppression rules he lacks standing to object to an alleged illegal search of Faye Howell's home and the seizure of the rental car agreement. Clemons asserts, however, the person against whom the government attempts to use illegally seized evidence has standing to challenge the seizure. Clemons points out that the purpose of the exclusionary rule is to deter police misconduct and to prohibit the government from profiting from its illegal activities; therefore, to insure the purpose of excluding evidence, standing cannot be an issue.

The Constitution prohibits only unreasonable searches and seizures. One moving to suppress evidence has the burden of proving not only that the search was illegal, but also that he or she had a legitimate expectation of privacy in the place from which the property was seized. Ownership of the property is one of the factors to be considered in determining whether an individual's Fourth Amendment rights have been violated, but an illegal search violates only the rights of those who have a legitimate expectation of privacy in the invaded place. One whose right of privacy of person or premises has not been invaded by the seizure of property has no right to object to that property being used as evidence. *State v. Bishop*, 240 Kan. 647, 658, 732 P.2d 765 (1987).

The law has long recognized that a person must have standing to object to an alleged illegal search. The constitutional guarantees against illegal search and seizure protect an aggrieved person's property, not property in which the person neither has, nor claims, any ownership or interests. We cannot expand the stated constitutional guarantee to allow Clemons standing to object to the alleged illegal search of Faye Howell's home. Since Clemons has no standing to exclude the evidence seized from another's home, we need not examine the State's claims the evidence was

admissible because (1) it would have been inevitable discovery through an independent source and (2) under the facts, the admission of the evidence was harmless error.

IV. Instructing the jury on aiding and abetting.

Clemons points out that he was charged in the complaint with first-degree murder. He contends the trial court violated his due process rights in giving an aiding and abetting instruction. He notes the State neither charged him with aiding and abetting nor presented any evidence of aiding and abetting. In addition, during its closing argument, the State attempted to refute the possibility that anyone else was the assailant by stating that Faye Howell did not actually shoot her husband.

Clemons denies he shot Howell or was at the scene of the crime. He admits the defense presented the testimony of one of Charles Howell's neighbors that the blue car was driven by a woman at about 7:50 a.m. on February 8, 1990. He alleges it was this single statement, made over the course of a very long trial, the court relied on to give the aiding and abetting instruction. Clemons claims that under such circumstances the aiding and abetting instruction was grossly unfair, extremely prejudicial, violated his right to due process, and constituted reversible error.

In *State v. Bryant*, 228 Kan. 239, 245-46, 613 P. 2d 1348 (1980), defendant had been charged as a principal. The defendant objected when the trial court gave an aiding and abetting instruction. On appeal, we held that the instruction was proper because from the totality of the evidence the jury could have reasonably concluded that defendant aided and abetted the principal in the crime.

We disagree with Clemons' claim that the only evidence that he aided and abetted in the killing was a single statement. During the trial, Clemons presented alibi witnesses to further his claim that he was not present when the shooting occurred. Kelly Hunt testified she observed a light blue compact car being driven out of the subdivision where Howell was killed and that the sole occupant of the car was a woman. On cross-examination of Bobbi Bolton, the defense attempted to establish that the person inside the car was a woman.

Clemons admitted that he assisted Faye Howell in picking up and returning the light blue rental car. The day the car was rented and the day before the murder, Clemons removed the rental car sticker from the rear of the automobile at Faye Howell's direction. After removing the sticker, Clemons and Faye Howell drove to the victim's home allegedly to take a picture of the house for the divorce proceeding. Clemons was driving the car on the day of the murder about 30 minutes after the time of the murder, and later that morning he and Faye Howell washed the car. Clemons stated he did not know how his personal keys were present in the rental vehicle, but testified that Faye Howell had access to his keys. He also testified that the car was parked outside his apartment from 8:45 p.m. on February 7, 1990, to 8:30 a.m. on February 8, 1990.

Although the State's theory of the case was that Clemons was the person who killed Charles Howell, from the totality of the evidence the jury could have reasonably concluded that Clemons aided and abetted Faye Howell in the commission of the crime. The trial court did not err in instructing the jury on aiding and abetting.

V. The evidence was insufficient for a rational factfinder to conclude guilt beyond a reasonable doubt.

Clemons asserts there is no direct evidence (1) he shot Howell or (2) placing him or the rented car at the scene of the crime. He further asserts there is no evidence that the rented car is the same vehicle Charles Howell's neighbors saw parked in the construction area behind Bobbi Bolton's residence.

Clemons contends that for the jury to convict him of first-degree murder it impermissibly used inferences on an inference. He argues that presumptions and inferences can only be drawn from established facts and that presumptions may not rest on presumptions or inferences on inferences, and where the trier of fact relies on circumstantial evidence, the circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances. *State v. Williams*, 229 Kan. 646, 649, 630 P.2d 694 (1981). Clemons argues that the jury could infer he fired the fatal shots only if proven circumstances and established facts are sufficient to permit the jury to conclude

he was in fact at Bobbi Bolton's residence at the time of the murder.

Clemons admits the only direct testimony that he was the person who shot Howell is that of Edward Henderson, a prisoner who was housed in the same module with Clemons in the Johnson County Jail. Henderson testified Clemons admitted killing Howell out of his love for Faye Howell and that Faye Howell had promised to reward him with one-half the insurance proceeds she would receive upon Charles Howell's death. Clemons claims Henderson's testimony is an uncorroborated extrajudicial confession which is totally inconsistent and incredible and, therefore, insufficient to sustain a conviction.

In addition to the other evidence linking Clemons with the shooting, in the 911 tape of Bobbi Bolton's conversation with the dispatcher, she described the car she had seen as being a rental car. Two other witnesses saw the car behind Charles Howell's residence and testified the rental car shown in the pictures at trial were similar to the car they saw the morning of the murder.

In his argument, Clemons confuses presumptions and circumstantial evidence. Although authorities note a difference exists between inferences and presumptions, as a matter of fact the terms are often used interchangeably. *Pearcy v. First National Bank,* 167 Kan. 696, 699, 208 P.2d 217 (1949). A presumption is an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action. K.S.A. 60-413. Under the criminal law, a presumption is only a permissive inference, leaving the trier of fact free to consider or reject it. An example of the presumption of intent is PIK Crim. 2d 54.01, which states:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

Circumstantial evidence is testimony not based on actual personal knowledge or observations of the facts in the controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved. *People v. Yokum,* 145 Cal. App. 2d 245, 251, 302 P.2d 406 (1956). Circumstantial ev-

idence is used to show the existence of a principal fact. It is well established in this jurisdiction that a conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Hanks*, 236 Kan. 524, Syl. ¶ 3, 694 P.2d 407 (1985).

When considering the sufficiency of circumstantial evidence to sustain a conviction of a crime the question on appeal is not whether the evidence is incompatible with any reasonable hypothesis except guilt. That question was for the jury and the trial court. *State v. Johnson*, 222 Kan. 465, 565 P.2d 993 (1977). When the sufficiency of circumstantial evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Hupp*, 247 Kan. 644, Syl. ¶ 6, 809 P.2d 1207 (1991).

After reviewing all the evidence, we are convinced there is sufficient evidence for a rational factfinder to have found the defendant guilty beyond a reasonable doubt.

VI. Whether the trial court imposed an illegal sentence by ordering incarceration and restitution.

K.S.A. 1989 Supp. 21-4603(2)(c) allows the sentencing judge to release the defendant on probation subject to such conditions as the court may deem appropriate, including orders requiring full or partial restitution. Rather than granting probation, if the court commits the defendant to the custody of the secretary of corrections or to jail, the court may specify in its order the amount of restitution to be paid and the person to whom it shall be paid if restitution is later ordered as a condition of parole or conditional release. K.S.A. 1989 Supp. 21-4603(2)(h).

In *State v. Bowers*, 239 Kan. 417, 428, 721 P.2d 268 (1986), we noted that a trial court may not sentence a defendant to imprisonment in an institution and also require the defendant to pay immediate restitution. We stated: "If the sentencing court chooses to set restitution, it should clearly specify in the journal entry that the amount and manner of restitution being ordered is not immediate, but said information is being provided for the benefit of the Kansas Adult Authority."

The State concedes that the trial court failed to follow the statute when ordering restitution in the amount of $1,000.

Affirmed in part and reversed in part. Conviction affirmed and case remanded for technical corrections to the restitution portion of the sentence.