No. 86,231

STATE OF KANSAS, *Appellee,* v. RICHARD TARON POWELL,
*Appellant.*
(56 P.3d 189)

Opinion filed October 25, 2002.

*Debra J. Wilson,* capital appellate defender, argued the cause and was on the brief for appellant.

*Jerome A. Gorman,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is a direct appeal where Richard Taron Powell raises first impression issues that (1) requiring him to wear a stun belt at trial violated his Sixth and Fourteenth Amendment constitutional rights to effectively participate in his own defense and (2) the trial court abused its discretion when it ordered him to stand trial restrained by a stun belt. Powell also contends reversible error was committed when the trial court failed to inquire if jurors were exposed to a prejudicial television report during trial in violation of his Sixth and Fourteenth Amendment constitutional rights to a fair trial and impartial jury.

Powell was charged and convicted of one count of capital murder and one count of criminal possession of a firearm in the shooting

deaths of brothers Mark and Melvin Mims. During the sentencing phrase, the trial court found Powell was mentally retarded in accordance with K.S.A. 21-4634 and that a sentence of death could not be entered.

Because Powell does not challenge the sufficiency of the evidence for either conviction, we will highly summarize the facts only to provide background for our findings on the errors claimed.

*Factual Background*

Three witnesses, Brandy McCullough, Myron Williams, and Donte Jones, testified that on the night of February 5, 1998, Powell told them he had killed Mark and Melvin Mims. Myron Williams was Powell's nephew and was living with Brandy McCullough. He testified after hearing gunshots, Powell came to their house and was spaced out, ranting and raving, talking crazy, jumping up and down, and calling himself a serial killer. Williams said Powell had a gun and claimed to have shot the Mims brothers. When asked why, he replied they had tried to rob him.

McCullough described Powell as "hyped up" and saying, "I just smoked them. I just smoked them niggas." She said Powell told them that the Mims had threatened him with a gun but they did not use it so he used it on them. McCullough admitted she had received a $1,000 reward for her information through the TIPS hotline.

Donte Jones had talked with Powell on late February 5 or early February 6. He testified that Powell had told him to watch news reports that there were two brothers dead. At trial, Jones testified Powell told him they would be found on 6th Street, parked in a car (as they were). According to Jones, Powell said he shot them because they were disrespecting him.

McCullough's and Williams' testimony was directly contradicted by that of Powell's sister, Venisa. She was in the room with McCullough and Williams on the night in question. She testified she did not hear Powell say anything about killing anyone. She disputed McCullough's claim that Richard was raving about killing someone. She did admit she had been diagnosed with a mental illness and was taking medication.

There was testimony of considerable drug usage by the parties and arguments between Powell and Melvin Mims on February 5, 1998. All the physical facts were sufficiently established. The jury returned a guilty finding on both charges.

## Imposition of the stun belt

Selection of the jury occurred between June 28 through June 30, 1999. Trial was recessed for approximately 2 weeks before opening statements and presentation of evidence commenced on July 12, 1999.

On that morning and immediately prior to empaneling the jury, the State, on behalf of the sheriff, requested that Powell be required to wear a stun belt. The trial court noted that the sheriff was in charge of security outside of and in the courtroom and asked the reason for the request.

Lieutenant Davis of the sheriff's department gave testimony in support of the request. He first noted this was a capital murder case. He said Powell had been in the detention center for quite a while on a previous case and the present one. On June 16, 1998, Powell had an altercation with another inmate who was stabbed five times with a shank (a homemade weapon) that was found where the injured inmate saw Powell throw it. Powell was charged with aggravated battery and traffic in contraband in a correctional institution, but the case was dismissed at the preliminary hearing when the victim refused to testify.

Powell was again found in possession of a shank on March 23, 1999. This time it was a toothbrush sharpened to a point which was found in his cell in a shampoo bottle. Charges were filed, and this case was pending. Davis stated Powell had been placed in segregation numerous times and opined that Powell was a threat to the safety of the public and to the court.

The prosecutor mentioned two other incidents. He stated that several weeks earlier, Powell had been brought to a hearing where the termination of parental rights of several of his children was in issue and had behaved in such a manner that he was removed from the courtroom by court order. He also related, after the trial court had initially ruled, that another shank had been found in the gym-

nasium of the jail over the weekend prior to the trial reconvening. Powell was the last individual to leave the room, but there was no evidence to place it directly on or with him.

In opposing the motion, Powell argued that he had appeared several times before the court without incident, including the jury selection 2 weeks previously. He questioned why the sheriff's department would now decide a stun belt was needed. Powell's counsel noted he had no experience with stun belts but contended the best evidence was how Powell had previously behaved and that sufficient reasons had not been shown to justify the request.

The trial court initially ruled as follows:

"Well, I personally have had no problems with Mr. Powell in this case. I do recall, however, I think he had refused to come out of his cell for a hearing on this case early on. And — and I understand your position and my position is the sheriff is in charge of security. If he thinks it's necessary, I'm gonna allow it as long as I'm satisfied that it is, in fact, unobtrusive and doesn't call any special attention to the defendant.

"This is a capital case. We have a lot of spectators. We have a lot of jurors. While I don't anticipate — I mean, Mr. Powell has never given this Court any reason to believe he's gonna act anything other than how he has and that is in a reasonable fashion. I expect that. But I think the sheriff has given us an adequate reason for using the stun belt for security measures."

After the prosecutor stated that a shank had been found in the gymnasium the preceding weekend, the court agreed with the defense counsel there was nothing to connect that specific shank to Powell. The judge concluded:

"But from the sheriff's perspective, he's adding that to the pile that he already has and, in his opinion, it's significant and I can understand the connection. So for all the reasons we've talked about here today, I'm gonna allow the use of the belt."

Two documents relating to usage of a stun belt, the "authorization for use" of the electronic belt system and the "inmate notification" were then made a part of the record.

The reasons for consideration of the use of the belt system on the authorization for use form were stated to be:

"2. Seriousness of current charges.
"3. History of institutional violence especially assaults on staff.

"4. History of verbal or physically assaultive behavior towards staff or officers of the court."

The authorization for use form contained medical instructions that stated the belt system may not be used if any of the following medical conditions exist:

"1. May not be used on pregnant women
"2. May not be used on people known to have heart diseases, multiple sclerosis, multiple dystrophy, or epilepsy."

The inmate notification form advised Powell:

"If activated, this belt discharges 50,000 volts of electricity. By means of a remote transmitter, a Deputy has the ability to activate the stun package attached to the belt, thereby causing the following results to take place:

"1. Immobilization, causing you to fall to the ground.
"2. Possibility of self-defecation.
"3. Possibility of self-urination."

This form further advised Powell that the belt could be activated if he did any of the following:

"1. Tampering with the belt.
"2. Failure to comply with the Deputy's verbal order to halt movement.
"3. An attempt to escape custody.
"4. Taking any action which indicates an attempt to inflict bodily harm on another person.
"5. Any intentional attempt to avoid visual contact by the Deputy."

Powell was asked to sign the inmate notification form, but he refused to do so.

After the stun belt was installed and before the trial commenced, defense counsel argued that while the belt was probably not visible while Powell was seated it would be visible when he stood up. Defense counsel's concern was that if the belt was seen, the jury would assume Powell was a "bad guy." The trial judge stated he looked closely at Powell when he entered the room and observed the belt was not an obvious sight unless for some reason someone brought special attention to it. The judge stated: "So the record is clear your position on it and I am approving the use of the same."

At no time during trial was the belt activated or was attention brought to the belt. There was no mention of any detrimental effect

of the stun belt in the motion for new trial, which was filed and denied. Powell elected not to testify, and in the colloquy showing this was his free and voluntary decision there was no mention that his actions were in any manner effected by wearing the belt. In short, the result we ultimately reach in this case is driven factually by a complete and total absence or showing of any prejudicial effect arising out of Powell wearing the stun belt.

*Claimed potential exposure of jury to Powell's prior homicide conviction.*

After the jury was selected, the trial judge began with the following admonishment:

"In order to keep an open mind, don't listen to or read any news accounts of the trial proceedings. These accounts are based upon incomplete information and they sometimes give a distorted view of the case. Perhaps a reporter will walk in and sit down—I haven't—I've seen one since we've started jury selection. I haven't seen anything in the paper yet about this particular case, but I can assure you as trial time gets closer, there will be some. These guys listen to a piece of testimony or they get it in their heads to write about something they think is important, has absolutely nothing to do with what's going on here in court. Please disregard that.

"Everybody here that reads the newspapers is familiar with the sections that deal with the trial proceedings in the various locations in the greater Metropolitan Kansas City area. You can save them up if you'd like. You can have your family and friends save the newspapers for you and you can review them at your length after this is all over with. But, until that time, you can't — you can't read it. You can't listen to it. You can't have anything to do with it. Again anything like that happens, don't share it with anybody else. Let the bailiff know and we can try to take care of it."

During the lunch recess of the first day of trial, the court again admonished the jury to not read any news accounts. The court stated that if there was any question about whether a juror had come into contact with a news item, the juror was to tell the bailiff what he or she had been exposed to but not speak to others about it. At the evening break, the judge again noted that he had seen a reporter there which meant there could be an article in the paper. He informed the jury they could not read the article.

On the morning of the second day of trial, defense counsel informed the court that both Powell and some court staff members had seen a televised news clip about Powell's trial, and that the clip

mentioned Powell's prior homicide conviction. Defense counsel complained that it would be prejudicial if the jury heard the newscast, and he also noted that the source of the information could have been the prosecutor's office, which would be a violation of the Kansas Rules of Professional Conduct.

The court expressed two concerns: (1) that neither the prosecution nor defense was responsible for exposing this information and (2) that the jury did not view the newscast. The court reminded counsel that it had admonished the jury repeatedly about media coverage and stated that, at this point, it had no indication that the jury was exposed to the broadcast. The court noted that it would continue to admonish the jury concerning media. The court informed counsel that the isolated issue remaining at that point was whether court personnel or the parties had disclosed the prior conviction to anyone. The judge then offered the following remedial action:

> "Well, let's do this. I don't see this yet as a serious issue. What I will ask [the prosecutor] to do during the course of today is to make inquiries of your office as to whether or not that information came from them. And see if you can satisfy [defense counsel's] curiosity and the Court's curiosity about this source.
>
> . . . .
>
> "As long as it did not come from you folks, then I will be—I'll be satisfied."

Both counsel agreed with the court's action, neither making any objection.

When the jury arrived, the judge gave it the following admonishment:

> "I just want to repeat to you the admonition about media coverage of the case, the news, the radio, television, radio and print. I've heard some things on television, also on the radio. I've seen an article in the paper. You absolutely, positively cannot be exposed to these — these things as — as we've talked to you about repeatedly. If anybody has a problem with anything like that, as I mentioned to you before, please keep it to yourself and then notify the bailiff and we will see what we can do about discovering whether or not it is a problem and what we can do about it, okay?"

The court again reminded the jury of the admonition during the lunch, afternoon, and evening recess. On the third and last day of trial, the court admonished the jury both at the lunch recess and

the evening recess. Deliberations began in the afternoon of the third day of trial, and a guilty verdict was delivered the following morning.

*Were Powell's Sixth and Fourteenth Amendment rights violated when the trial court required him to wear a stun belt during his trial?*

Powell first complains that requiring him to wear a stun belt put him in such anxiety and fear that he was unable to effectively communicate with his counsel and prohibited him from putting on his defenses in violation of his Sixth and Fourteenth Amendment constitutional rights.

There are two basic problems with this argument. First, as Powell concedes in his brief on appeal, this issue was not raised in the trial court. Our cases are legion that hold when constitutional grounds are asserted for the first time on appeal they are not properly before the appellate court for review. *State v. Mason,* 268 Kan. 37, 39, 986 P.2d 387 (1999); *State v. Steadman,* 253 Kan. 297, Syl. ¶ 5, 855 P.2d 919 (1993); *State v. Goss,* 245 Kan. 189, 193, 777 P.2d 781 (1989).

Powell correctly argues that under exceptional circumstances even though the issue was not raised below in order to serve the interests of justice or to prevent a denial of fundamental rights, we have considered constitutional arguments. *State v. Willis,* 254 Kan. 119, Syl. ¶ 3, 864 P.2d 1198 (1993), *State v. Clemons,* 251 Kan. 473, 483, 836 P.2d 1147 (1992); *State v. Puckett,* 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982). None of these cases justify our consideration here of constitutional issues not raised in the trial court.

*Willis* involved the defendant not being present when a deposition of a medical expert was taken and subsequently introduced at trial. In addition, the statutory procedures to utilize such testimony were not followed. *Willis* is self-distinguishing. Powell's counsel did not waive any rights on his behalf. Powell was present throughout the trial. By his refusal to sign the notification form and his counsel's argument against its usage, the propriety of the trial court's order was challenged. But, there is no showing of re-

stricted assistance to counsel. Powell shows no exceptional circumstances. *Willis'* facts do not support his argument.

*Clemons* and *Puckett* likewise do not support Powell's request based on exceptional circumstances. In *Clemons*, a constitutional argument not raised below was considered but quickly disposed of by a finding that he had no standing to raise the argument. *Puckett* involved the failure to allege an element of the crime, a conviction based on a defective information, and is clearly distinguishable.

Assertion of a constitutional right based on mere speculation in law and fact is not the type of infraction contemplated to be considered, when we set forth the requirement that constitutional issues be raised at the trial level.

The other cases Powell cites will be later considered, but they do not justify our reaching his constitutional claims.

We began our discussion of this issue by stating there were two basic problems with Powell's request. The first, failure to raise the issue below, precludes our consideration. The second will be more fully discussed in our consideration of Powell's abuse of discretion argument but, factually, there is clearly no showing of prejudice. The allegation that Powell was not "effectively present" has no factual basis. It was argued that there is "presumed prejudice," but *Riggins v. Nevada*, 504 U.S. 127, 118 L. Ed. 2d 479, 112 S. Ct. 1810 (1992), does not support that argument. In *Riggins*, the defendant was heavily medicated without proper factual findings and impairment was presumed. We will not presume an impairment here where none was shown and the record indicates to the contrary.

We decline to consider Powell's constitutional argument that his Sixth and Fourteenth Amendment rights were violated.

*Did the trial court abuse its discretion by requiring Powell to wear the stun belt during the evidence phase of the trial?*

The appellate standard of review where an abuse of discretion is claimed to require the granting of a new trial is a challenging one for a defendant. We have said:

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which another way of saying that discretion is abused only when no

reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion." *State v. Johnson*, 258 Kan. 607, 611, 907 P.2d 140 (1995).

Powell's argument to the trial court that the belt would be visible to the jury has been abandoned on appeal. He concedes in his brief that any claim that the jury was prejudiced by seeing the belt is not an issue. What Powell focuses on is that the lack of any previous incident in the courtroom and his proper previous conduct in this case do not support the trial court's imposition of the stun belt. Powell further argues that the trial court abdicated its role to control the courtroom to follow the sheriff's recommendation.

The State counters with a recitation of all the facts testified to by Lt. Davis and the statements of the prosecutor, including: the charge was capital murder, Powell was in custody on a conviction of involuntary manslaughter, a prior stabbing of another inmate, finding a shank in Powell's shampoo bottle, disruption at a severance hearing, refusal to come out of his cell for previous hearings, and the shank found in the gym when Powell had been the last to leave the previous weekend. The State argues that the court weighed all the evidence presented and found the belt's usage was justified.

We have not previously considered the propriety of the use of a stun belt during a criminal trial, but we have addressed the use of other restraints.

In *State v. Ninci*, 262 Kan. 21, 936 P.2d 1364 (1997), the defendant was required to wear a leg brace which was placed under his clothing. The trial court said that absent some compelling reason it would not involve itself in the control of prisoners by the deputies but observed the brace was unobtrusive. Nothing in the record showed that the jury even noticed the leg brace. Our unanimous opinion stated:

"The defendant has the burden of furnishing a record which affirmatively shows prejudicial error occurred in the trial, and absent such a record, the reviewing court assumes the trial court's action was proper. *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989). Ninci presented no evidence that the jury knew he

was wearing a leg brace, or that the jury detected his slight limp, or that the jury knew his limp was caused by a leg brace, or that the jury knew the leg brace was on for restraint reasons instead of for medical reasons. Thus, the State asserts that this court should assume the trial court's action in allowing the use of the leg brace was proper and affirm the trial court's ruling.

"The leg restraint in this case was so unobtrusive that it is not even clear the jury noticed it. Since the restraint was not inherently prejudicial, Ninci was required to come forward with some evidence indicating the jury at least noticed the leg brace or knew it was a restraint.

"In this case, the trial court relied on the deputy's decision in allowing the use of the brace. It is the trial judge's ultimate responsibility to assure a fair trial to the accused. The trial court did make an independent analysis that the leg brace was unobtrusive. Thus, without specific evidence of prejudice, the court allowed the brace. The trial court did not abuse its discretion, and its ruling on this issue is affirmed." 262 Kan. at 53-54.

A more detailed discussion of the usage of a leg brace and a troublesome comment of the trial court occurred in *State v. Davidson*, 264 Kan. 44, 47-52, 954 P.2d 702 (1998). Davidson had worn a leg brace throughout the trial, as was then required by the Johnson County Sheriff's Department. No objection had been made until the evidence had been submitted to the jury. Just prior to the instruction conference, the prosecutor, apparently believing that the limp caused by the brace may have caused the jury to feel sympathy toward the defendant, asked the court to instruct about the shackling. The defense counsel objected to any mention of shackling to the jury.

The trial judge then made the following comment to the jury:

" 'Prior to giving jury instructions, I want to make a note of one thing which occasionally arises and is often unexplained. If you'll recall, during either the opening statement or the voir dire examination, it was pointed out that Mr. Davidson is in custody, pending this trial. As part of the standard operating procedure of the Johnson County Sheriff's Department, the defendants who are in custody and are in trial are equipped with a leg brace which disables them from attempting to run. This is done in any case in which a defendant happens to be in custody.

" 'I mention that only for the purpose of indicating to you that it is not — the brace isn't there because of any disability of the defendant.' "

Davidson asserted that requiring him to wear the leg brace was error, and it was compounded by the trial court's comment. Our

opinion noted that the jury had been informed by the defense counsel in opening statement that Davidson was in custody.

We noted we had recently addressed this issue in *Ninci*. We looked to *Holbrook v. Flynn*, 475 U.S. 560, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986), as holding "that certain practices which pose a threat to the 'fairness of the fact-finding process' . . . must be subject to 'close judicial scrutiny.' 475 U.S. at 568 (quoting *Estelle v. Williams*, 425 U.S. 501 503-04, 48 L. Ed. 2d 126, 96 S. Ct. 1691 [1976])." *Davidson*, 264 Kan. at 49. We further said in *Davidson:*

"In *Estelle,* the Court emphasized that a defendant may be prejudiced if he or she appears before the jury bound and gagged. It pointed out that not only it is possible the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but also the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. 425 U.S. at 505." 264 Kan. at 49.

We then entered into a harmless error beyond a reasonable doubt analysis that apply in cases where the trial error deprived a defendant of a constitutional right as it related to "an unacceptable risk of impermissible factors influencing the jury." 264 Kan. at 51. Our *Davidson* opinion continued:

"We first emphasize the judge's remark that the sheriff's purpose for using the leg brace was to prevent an individual in custody from escaping served no legitimate purpose in the trial. . . . Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding the alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party.

"Control of an individual in custody from the jail to the courtroom and from the courtroom to the jail is the responsibility of the sheriff. All defendants have the right to appear before the jury free of restraints because such restraints present an unacceptable risk of prejudice and compromise the presumption of innocence. It is the judge's responsibility to insure that the defendant receives a fair trial. In extreme situations, a particularly obstreperous and disruptive defendant may be ordered to be restrained in the courtroom by the judge.

"Neither the sheriff nor the trial judge, consistent with the Fourteenth Amendment due process or equal protection requirements, can compel all persons in custody to stand trial before a jury to wear a leg brace to prevent escape. Here, Davidson was prejudiced because the trial judge's comment emphasized that the purpose of the leg brace was to prevent escape. This is disturbing because it implied that an accused in custody of the sheriff is more apt to flee than an accused

free on bond. The trial judge's surrender of the control of the courtroom to the sheriff and the judge's comments as to the reason the defendant was wearing a leg brace were error. However, the defendant's failure to object is normally sufficient to negate the presence of compulsion necessary to establish a constitutional violation. *Estelle*, 425 U.S. at 512-13.

"Here, the evidence of Davidson's guilt is overwhelming.

. . . .

"After reviewing the record, we can say without any doubt that the judge's erroneous comments to the jury had little, if any, likelihood of changing the result of the trial." 264 Kan. at 51-53.

Davidson's convictions were affirmed, but the language of our opinion is particularly instructive as to the duties and obligations of trial judges where some restraint is imposed on a defendant during a criminal trial.

We also point to *State v. Williams*, 228 Kan. 723, 621 P.2d 423 (1980), where issues of self-representation were involved but the defendant was extremely disruptive, broke away from officers, and was unruly and profane; the trial court, after a hearing, ruled that under the circumstance he had no alternative but to order all restraints—leg irons, wrist chain, handcuffs—left on the defendant.

Our *Williams* opinion held that a defendant in a criminal case should not be tried while in handcuffs or shackles except in unusual, compelling, and exceptional circumstances, and the record should clearly reflect why restraints are ordered. 228 Kan. at 730-31. We concluded that the trial judge did not abuse his discretion:

"The trial judge in the case at hand made a careful record of the proceedings. He expressed reluctance to impose restraints, and ordered only the least restrictive restraints required. He directed that they be discontinued when it became apparent that restraints were no longer necessary. The trial judge exercised his discretion carefully. We find no abuse." 228 Kan. at 731.

The three cases referenced to above set forth in great detail our recent precedent in Kansas on the usage of restraints. Here, we have recited in detail the record at the time the stun belt was imposed. Powell's appellate counsel reasons that a more extensive record was not developed because the request to use the stun belt was made without prior knowledge to Powell's trial counsel and the parties had little previous experience with the issue. While we believe an adequate record was developed for us to resolve the

issues presented, we will look to several of the cases cited by Powell on appeal as they relate to the usage of stun belts in other jurisdictions.

We first look to a recent case, *Wrinkles v. State*, 749 N.E.2d 1179 (Ind. 2001), where the Indiana Supreme Court refused to grant post-conviction relief to a defendant convicted of three counts of capital murder and sentenced to death because trial counsel's performance on the issue of restraints was not deemed to fall below an objective standard of reasonableness. However, the court agreed with the ruling of the federal district court judge in *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244 (C.D. Cal. 1999), *aff'd in part, rev'd in part, and remanded* 251 F.3d 1230 (9th Cir. 2001), prohibiting utilizing a stun belt and held:

"Although not all courts have taken this stance, we agree with the observations of the federal court judge and thus hold that henceforth stun belts may not be used on defendants in the courtrooms of this State. This is so because we believe that the other forms of restraint listed above can do the job without inflicting the mental anguish that results from simply wearing the stun belt and the physical pain that results if the belt is activated." 749 N.E.2d at 1194.

Powell's reliance on *Wrinkles* and *Hawkins* is subject to question. Hawkins had been fitted with a stun belt. During a hearing, he made several statements out of order and acted in a generally disruptive manner resulting in its activation. Hawkins later sued the court and other governmental officials for damages and for an injunction against further usage, and he attempted to certify a class. The federal district court granted the preliminary injunction and observed stun belts have a chilling effect on a defendant's defense and have the potential to compromise an individual's ability to participate in his or her own defense.

However, this ruling was overturned in part by the Ninth Circuit Court of Appeals as being overbroad. 251 F.3d at 1242. The appeals court stated:

"The stun belt offers more effective protection of courtroom security than alternative methods. Activated by the touch of a button, it can neutralize a security threat instantly and remotely. So long as the prejudice resulting from its use is no greater than that of the alternatives, we should be reluctant to deny recourse to what may be a valuable tool in protecting courtroom security.

"We have seen that in shifting the focus from disruption to security, the belt's 'chilling' effect becomes less prejudicial and the alternatives more so. For this reason, the district court findings regarding disruption do not support the injunction in the context of security. We therefore conclude the district court abused its discretion in ruling that a serious question of a Sixth Amendment violation existed as to the use of stun belts to maintain courtroom security." 251 F.3d at 1242.

While usage of the belt to restrain a vocally disruptive defendant was improper, the Ninth Circuit held its usage to protect courtroom security was not. 251 F.3d 1242-43. The record in Powell's case undisputedly shows that the belt was placed on him for courtroom security reasons. The acts stated on the notification form relate to safety, attempting escape, and tampering with the belt.

Additionally, the *Hawkins* opinion stated the "chilling effect" on a defendant may be decreased where the defendant is represented by counsel and where the defendant does not testify. The opinion stated "threats of violence or escape are sufficiently identifiable to permit a defendant to advocate his cause without fear that excessive zealousness will be mistaken for such a threat." 251 F.3d at 1240. The court held that judges must balance the safety of the court, jury, and spectators with the rights of the accused, and they must consider whether alternatives are less prejudicial. 251 F.3d at 1240.

The *Hawkins* court looked to the use of shackling as being potentially prejudicial, surrounding a defendant with guards as being prejudicial, presence of firearms as dangerous to third persons, and threats of contempt as often being meaningless.

The Ninth Circuit opinion had been filed approximately 30 days prior to the *Wrinkles* decision, but the Indiana Supreme Court appears to have also relied on law review articles negative to stun belt usage. See Comment, *The REACT Security Belt: Stunning Prisoners and Human Rights Groups into Questioning Whether Its Use Is Permissible under the United States and Texas Constitutions*, 30 St. Mary's L.J. 239 (1998), Brienza, *Stun Belts Zapped by Civil Liberty Groups*, 35 Trial 99 (Apr. 1999).

We note the *Wrinkles* opinion cited *Young v. Georgia*, 269 Ga. 478, 479, 499 S.E.2d 60 (1998), and *Holloway v. Nevada*, 6 P.3d 987, 994 (Nev. 2000), as cases where stun belt usage had been approved. See *Wrinkles*, 749 N.E.2d at 1194 n.4.

We are not prepared to follow Indiana in a prospective ban on stun belts, even though we could do so and still affirm Powell's conviction because of the complete lack of any prejudice that is shown by the record in his case.

We believe a better view is provided in part by the recent case *People v. Mar*, 28 Cal. 4th 1201, 124 Cal. Rptr. 2d 161, 52 P.3d 95 (2002), a California Supreme Court decision filed August 22, 2002. While the facts in the *Mar* case, as in most, drive the result, the charges in the *Mar* case included defendant Mar's resisting a police officer, resulting in serious injury to an officer while the officer was attempting to move an agitated Mar to a specially padded "detox" cell. The testimony of both sides differed at trial, but the appeal was limited to the issues arising out of the usage of the stun belt.

Mar said he was nervous with the belt on, afraid it was going to be activated, said it stuck out in the back, and asked it to be removed while he was testifying. The trial court was concerned over Mar losing control of his emotions, pointed to a prior incident during transportation, and told Mar it was in his best interest to make sure that nothing happened in the courtroom during the trial in front of the jury. Mar testified on his own behalf. The transcript reflected he became excited and spoke rapidly, but he was able to testify at length as to his version of the events. The belt was not activated at any time during the trial.

While *Mar* did not contain facts about stun belts, the opinion relied on numerous articles, including those previously cited which were relied on in *Wrinkles*. The *Mar* court relied in most part on its earlier decision in *People v. Duran*, 16 Cal. 3d 282, 127 Cal. Rptr. 618, 545 P.2d 1322 (1976), where the limited circumstances under which a defendant may be subjected to physical restraints such as shackles or manacles are now held to apply to the use of a stun belt. 28 Cal. 4th at 1219-20.

The *Mar* opinion followed California's earlier *Duran* decision in holding that when it is established that it is appropriate to impose some restraint upon a defendant as a security measure, the trial court must authorize the least obtrusive or restrictive restraint that effectively will serve the specified security purpose. 28 Cal. 4th at 1205-06, 1225-26. The *Mar* court disagreed with reasoning that

would suggest that a stun belt should be viewed as the security device of choice. It was held that the psychological effect of wearing the device was to be considered and that it might impair a defendant's ability to "think clearly, concentrate on the testimony, communicate with counsel at trial and maintain a positive demeanor before the jury." 28 Cal. 4th at 1226.

The *Mar* opinion further looked to the possibility of accidental activation and possible medical risks and suggested that consideration should be given to whether the design of the belt could be lowered to lesser voltage or shortened in duration. 28 Cal. 4th at 1226-30. The opinion concluded:

"In sum, the compelled use of a stun belt as a security measure in a criminal trial, over a defendant's objection, raises significant questions that generally have not been addressed by trial courts asked to approve the use of this relatively novel type of security device. Before a trial court approves the use of such a device in the future, the court must consider [applicable] factors and may approve the use of a stun belt only if it determines that the use of the belt is safe and appropriate under the particular circumstances." 28 Cal. 4th at 1230.

In another recent case, *United States v. Durham*, 287 F.3d 1297, 1330 (11th Cir. 2002), defendant's conviction was vacated and the case remanded for more sufficient findings on the record to justify the use of the stun belt. The *Durham* court stated:

"[A] decision to use a stun belt must be subjected to at least the same 'close judicial scrutiny' required for the imposition of other physical restraints. *Elledge*, 823 F.2d at 1451. Due to the novelty of this technology, a court contemplating its use will likely need to make factual findings about the operation of the stun belt, addressing issues such as the criteria for triggering the belt and the possibility of accidental discharge. A court will also need to assess whether an essential state interest is served by compelling a particular defendant to wear such a device, and must consider less restrictive methods of restraint. Furthermore, the court's rationale must be placed on the record to enable us to determine if the use of the stun belt was an abuse of the court's discretion." 287 F.3d at 1306-07.

In *United States v. Edelin*, 175 F. Supp. 2d 1 (D.D.C. 2001), the defendant in a capital murder trial moved to preclude the use of stun belts. He argued, in part, that the belt interfered with his ability to assist counsel. The trial court, in the published order, set forth a 12-part test in determining whether the use of stun belts was appropriate:

"1) the seriousness of the crimes charged and the severity of the potential sentences; 2) the numerous allegations of threats of violence made by the defendants against witnesses; 3) previous guilty pleas or convictions of a substantial number of the defendants to prior gun charges and/or violent crimes; 4) belligerent and threatening comments made to the Deputy U.S. Marshals by each of the defendants other than defendant Tommy Edelin; 5) allegations of gang activity, and the likelihood that associates or rivals of the alleged gang may be present at the trial; 6) the strong opinion of the U.S. Marshal for this District, particularly as it relates to knowledge of security in this courthouse and with cases of this nature; 7) potential prejudice to the defendants through the use of the stun belts; 8) likelihood of accidental activation of the stun belts; 9) potential danger to the defendants if the belts are activated; 10) the availability and viability of other means to ensure courtroom security; 11) the potential danger for the defendants and others present in the courtroom if other means are used to secure the courtroom; and 12) the existence of a clear written policy governing the activation of stun belts worn by defendants." 175 F. Supp. 2d at 5.

After analysis, the court found each of the twelve factors to favor use of the stun belt on the defendant and some of the witnesses. 175 F. Supp. 2d at 5-7.

Cases involving restraints before our Tenth Circuit Court of Appeals have not developed as extensive a commentary on the issue of the use of shackles and stun belts as in other United States Circuit Courts of Appeals.

*Yates v. United States*, 362 F.2d 578, 579 (10th Cir. 1996), states:

"Appellant also asserts that the trial court erred in denying his motion for mistrial because on one occasion he was brought into the courtroom while shackled. When the incident occurred the trial court formally inquired into the matter and determined that appellant's appearance in the courtroom while under restraint had occurred briefly about twenty minutes before one session began and in the presence of perhaps ten unidentified people. There was no evidence that any juror saw the incident. On motion for new trial the court gave further consideration to the possible impact of the happening upon the rights of appellant and found that only reasonable restraint had been imposed upon appellant and that he was not prejudiced thereby even if observed by any juror, there being no evidence that any juror had in fact observed appellant under restraint. We are satisfied that the record reflects no abuse of judicial discretion in such regard and that the trial court, after its careful inquiry, did not err in denying the motion for mistrial. *Glass v. United States*, 10 Cir., 351 F.2d 678 [1965]."

A later case, *United States v. McKissick*, 204 F.3d 1282 (10th Cir. 2000), involved a stun belt and the opinion limited the discussion to the following:

"1. The Use of a Stun Belt

"After the completion of jury selection, but before opening arguments, counsel for Mr. Zeigler approached the bench and informed the court he had just learned the defendants were wearing stun belts beneath their clothing. The court confirmed it had approved such a precaution and noted the devises were not noticeable. During a hearing in chambers the next morning, the court set forth its reasons for allowing the stun belts to be used. Among these reasons, the court noted the United States Marshals suspected other gang members from Los Angeles might attempt to disrupt the proceedings. The court also found the stun belts were not visible under the defendants' clothing. Although Mr. Zeigler's counsel had not noticed the belts because he was sitting across the table from the defendants, he argued the jury might have been able to see them. However, there is no evidence in the record that any member of the jury noticed the stun belts. Thus, we do not presume prejudice to Mr. Zeigler and conclude the court did not abuse its discretion in denying Mr. Zeigler's motion for a mistrial. See *Yates v. United States*, 362 F.2d 578, 579 (10th Cir. 1966) (no prejudice to the defendant found where there was no evidence any juror in fact observed him wearing shackles in the courtroom)." 204 F.3d at 1299.

Based on the record before us, we hold it was *not* an abuse of discretion for the trial court to order Powell to wear the stun belt for the evidence portion of the trial. There is absolutely no showing of any prejudice of any nature whatsoever. Powell elected not to testify. The usage of the belt was not shown to have been a factor in the exercise of this decision. The usage of the belt did not hamper Powell's right to receive a fair trial. There was an adequate record to justify the trial court's decision to impose the stun belt. Although it may be argued that undue deference was given to the sheriff's wishes, we hold the trial court did not abuse its discretion under the facts of this case.

Having so held, we now also repeat what we said in both *Ninci* and *Davidson*. It is the trial judge's responsibility to insure that a defendant receives a fair trial. The sheriff is in control of the defendant outside the courtroom, but, within the courtroom, the obligation of courtroom security becomes a matter of shared concern. While deference should be given to law enforcement officers with security obligations, the trial judge must retain complete control over the courtroom and exercise his or her discretion in finally determining if restraints are to be utilized. Prior conduct in court proceedings is an important factor to be considered. If authorized,

the trial court must utilize the least obtrusive or restrictive restraint that will effectively serve the specified security purposes. Consideration should also be given whether the imposition of a restraint is related to security reasons or disruptive expectations.

Each case must turn on its individual facts. We hesitate to set forth any list of factors required to be considered. But, the background of the defendant; the nature of the charges; evidence of dangerous incidents; testimony about the restraints sought to be used; prior conduct of the defendant; the objection to use of the restraint and/or the election by the defendant whether to testify; the physical facts of the individuals and the courtroom; the presence or absence of victims, family, or spectators; and other factors that will vary from case to case must be considered by the trial court. Manifest necessity as used by the California court in the *Mar* case means that the need for the usage of restraints is clearly apparent. But, what that necessity is in the final analysis must be left to the sound discretion of trial judges who have direct contact with difficult situations and must have the necessary flexibility to insure that fair trials are held consistent with safety to all concerned.

*Did the trial court commit reversible error when it failed to inquire if the jury had been exposed to a newscast that discussed Powell's prior homicide conviction?*

During the second day of trial, Powell brought to the court's attention a newscast his counsel and some court staff had seen which mentioned Powell's prior homicide conviction. The court had, as we set forth in the facts, repeatedly advised the jury not to view any news report concerning Powell's trial and continued to do so throughout the trial.

The trial court inquired as to the potential source of the information although, as the prosecutor pointed out, the fact of Powell's prior conviction was information accessible to the public. After hearing Powell's concern, the court again admonished the jury to avoid looking at or reading media reports. Powell did not further object or request the jury to be polled to determine if the newscast had been viewed.

Now on appeal, Powell contends the trial court should have questioned the jury to see if anyone had seen the newscast in question.

This contention is directly contrary to a long line of Kansas cases where we have held that polling the jury would likely draw attention to a media report and might further prejudice them. We so held in *State v. Stewart*, 219 Kan. 523, 548 P.2d 787 (1976), and have continued that holding in *State v. Yurk*, 230 Kan. 516, 522-23, 638 P.2d 921 (1982), and several other cases. We see no reason to change our long-time rule and decline to follow several Tenth Circuit Court of Appeals cases cited to us by Powell that espouse a duty to inquire. We believe the potential for placing prejudicial material before a jury exists, and to inquire as to media reports places an unnecessary burden on trial courts.

The trial judge here admonished the jury on every occasion not to consider media reports. There is nothing to show this admonition was not followed. We continue *Stewart* and its progeny as our Kansas rule.

The convictions are affirmed. The requests for a new trial were properly denied.

LARSON, S.J., assigned.